Tarbox v. Sughrue.

--------

R. W. Tarbox v. P. F. Sughrue.— L. W. Cherrington v. J. G. Jerningan.— R. Gaede v. S. Gallagher.— E. J. Beard v. Chas. Van Tromp.

1. Quo Warranto.—*Lies When, When Not.*   A proceeding in the nature of *quo warranto* lies to a great extent within the discretion of the court; and generally *quo warranto* will not lie where there is another plain and adequate remedy; but as the statute making provision to contest the election of one declared elected to a county office does not authorize the removal from office of the contestee, and is inadequate for that purpose, *quo warranto* will lie at the suit of one who claims to have received the greatest number of votes for a county office, not only to try the title to the office, but to remove the defendant therefrom as well.

2. Intimidation of Voters; *Election, When Not Vitiated.*   Where the election board honestly discharges its duty, and the mass of the

15 — 36 kas.

voters are given a fair opportunity to cast their votes, a slight disturbance and casual fray at the polls is insufficient to vitiate an election, or to justify the voters in abandoning the polls ; and where the validity of the election is questioned on the ground that voters were deterred from voting by violence and intimidation, it should appear that the number deterred was sufficient to change the result, or that by reason thereof the true result could not be ascertained from the returns.

3. DECLARED RESULT ; *Rule.* As a general rule, the declared result of an election will not be disturbed by reason of the reception of illegal votes, unless the number be sufficient to vary the result.

4. ILLEGAL VOTING ; *Incompetent Evidence.* The statements of witnesses of what others not parties to the record told them subsequent to an election in regard to voting without right, is incompetent to establish the charge of illegal voting. (*Gilleland v. Schuyler,* 9 Kas. 569.)

5. TESTIMONY, *Admissible, but Not Very Reliable.* Testimony with regard to the registration and poll lists of previous and subsequent elections, as well as testimony by old residents that some of the persons whose names appear on the returns of a contested election were unknown to them, may be received in evidence for what it is worth as tending to establish illegal voting, but such testimony is not very satisfactory nor reliable, and is of much less weight and force in a new country where a large immigration is pouring in, and where there is a shifting and unsettled population, than in an older portion of the country, which is more settled, and where the population is more stable.

6. FRAUD ; *Burden of Proof.* A party challenging the validity of an election on the ground of violence, intimidation and fraud must prove the same; and in this case the evidence is examined and held to be insufficient to vitiate the election or vary the declared result.

*Original Proceedings in Quo Warranto.*

ACTION brought in this court January 20, 1886, by *R. W. Tarbox* against *P. F. Sughrue,* to determine the title of the parties to the office of sheriff of Ford county : also, certain other proceedings in the nature of *quo warranto,* to wit, *Cherrington v. Jerningan; Gaede v. Gallagher; Beard v. Van Tromp.* The opinion, filed at the February, 1877, session of the court, states the material facts.

*C. N. Sterry,* and *Bowman & Bucher,* for plaintiff.

*J. T. Whitelaw, J. H. Finlay, J. W. Ady, J. H. Gillpatrick,* and *Rossington, Smith & Dallas,* for defendant.

The opinion of the court was delivered by

JOHNSTON, J.: This is an original proceeding in the nature of *quo warranto*, to try the title of R. W. Tarbox and P. F. Sughrue to the office of sheriff of Ford county. Both of them were candidates, and both claimed to have been duly elected at the general election held in November, 1885. At that election there were three tickets in the field, known as "people's," "democratic," and "independent." The plaintiff, Tarbox, was the candidate for sheriff on the independent ticket, and the defendant, Sughrue, was the candidate on the people's ticket, while one T. J. Tate was the democratic candidate. The result of the election, according to the canvass made by the county commissioners at the time appointed by law, was, that Sughrue received 1,052 votes, Tarbox 926 votes, and Tate 189 votes. Sughrue was thereupon declared elected by a plurality of 126 votes, and a certificate of election was accordingly issued to him.

The correctness of this result is challenged by the plaintiff, who claims to have received the greatest number of legal votes cast at that election. It is conceded that the election was held and conducted in a lawful manner throughout the county, except in Dodge precinct. In regard to that precinct, the plaintiff alleges and attempts to prove that a number of lawless persons, with the knowledge and consent of the candidates on the people's ticket, took possession of and surrounded the voting-place on the morning of the election, and by their threats and conduct intimidated and kept away from the voting-place legal voters who desired and intended to vote for the plaintiff; and that they fraudulently and illegally procured and had cast illegal votes by persons not electors of the precinct; and that repeating and illegal voting were carried on to such an extent, that in the precinct where there are not to exceed six hundred legal votes, ten hundred and eighty-two were recorded as having been cast. It is alleged that the judges of the election of that precinct were knowing to and connived at the fraudulent and illegal voting, and that those who desired to prevent

the illegal voting and to challenge the voters and repeaters, were threatened and driven away from the voting-place. It appears that prior proceedings of injunction and mandamus were begun with a view of inquiring into the validity of this election; but these have been passed over, and instead, the present direct proceeding has been brought.

The defendant presents as a preliminary question, an objection to the jurisdiction of this court. The objection is that a proceeding in the nature of *quo warranto* cannot be maintained where there is another plain and adequate remedy. That principle has received the approval of this court. (*The State, ex rel., v. Wilson,* 30 Kas. 661.) But is the remedy suggested by the defendant an adequate one? He contends that such a remedy is furnished in the statute providing that an election of a person who has been declared elected to a county office may be contested. (Gen. Stat. of 1868, ch. 36, §§ 85–105 inclusive.) It is true that under that act there may be a full inquiry into the validity of the election, and the rights of the claimant under the election may be adjudicated; but the ouster of the defendant from the office, which is a part of the remedy sought in this proceeding, cannot be obtained. The judgment rendered by the contest court under that statute is stated in § 101, as follows:

"The court shall pronounce judgment, whether the contestee or any other person was duly elected; and the person so declared elected shall be entitled to his certificate upon qualification. If the judgment be against the contestee, and he has received his certificate, the judgment annuls it. If the court finds that no person was duly elected, the judgment shall be that the election be set aside."

Thus it will be seen that the judgment does not go to the extent of removing the incumbent of the office, but only settles the validity of the election, who, if anyone, is entitled to the office, and to the certificate of election, and may annul the certificate that has been granted to any successful contestee. It still remains to obtain the possession of the office; and unless voluntarily surrendered by the incumbent, a direct proceeding like the present

1. Quo warranto—
lies when,
when not.

one would be required to effectuate that purpose. To oust the defendant, the remedy proposed is inadequate; and therefore the present proceeding which to a great extent is within the discretion of the court, will lie.

The case must therefore be examined on its merits; and the first matter we will consider is the claim that the voters were deterred from voting by violence, threats, and intimidation. More than one thousand pages of closely-written testimony have been taken in the case, a great portion of which was directed to this question; but we are of the opinion that it falls far short of supporting the charge. The poll was opened and the election board organized without contention or disturbance. Zealous champions of the respective tickets were on the ground advocating the claims of their candidates, and it is true that some loud talk and boisterous conduct were indulged in. The most serious disturbance referred to is the testimony of several, that one Masterson, a challenger for the people's ticket, struck another named Jones, who was challenging for the opposite party, a blow in the face. It appears that the blow was given by a backward movement of the arm, and that Masterson was not looking in the direction of the one who was struck, and the explanation of the circumstance given by Masterson is, that he was pushed off his balance by persons who were crowding up to the window where the votes were received, and that the blow was wholly accidental. There was testimony of other slight disturbances and threatening talk during the day, but we think nothing occurred there which showed a preconceived purpose to intimidate the voters, or which materially affected the result or freedom of the election.

2. Intimidation of voters; election, when not vitiated. If the election board continues to honestly discharge its duty, and a fair opportunity is given to vote, a slight disturbance and casual fray such as frequently occur at elections will not vitiate an election, or justify voters in abandoning the polls. In respect to violence and intimidation, Judge McCrary, in his work on Elections, § 416, says:

"The violence and intimidation should be shown to have

Tarbox v. Sughrue.

been sufficient either to change the result, or that by reason of it the true result cannot be ascertained with certainty from the returns. To vacate an election on this ground, if the election were not in fact arrested, it must clearly appear that there was such a display of force as ought to have intimidated men of ordinary firmness."

The principal question is, whether the great body of electors had an opportunity to freely cast their ballots. Many witnesses, some of whom were adherents of the plaintiff, have testified that the election was conducted in an orderly and peaceable manner, and that those who were entitled to vote could and did vote without difficulty. Then there is the fact that a full vote was cast. Besides, it appears that friends of the ticket headed by the plaintiff remained at the polls throughout the day, and that 238 votes were cast in favor of the plaintiff, and 70 votes for the democratic candidate. There is a claim that Masterson, who is said by some of the witnesses to be a dangerous man, threatened violence to four citizens of Dodge in case they appeared at the polls on election day. It is denied that any such threat was made. It does appear that the men spoken of by Masterson were personal enemies, and that something which was said by them derogatory of himself provoked the making of the threat. Whatever was said by him at that time related only to those four persons; and if a threat was made as is claimed, and those persons were thereby deterred from voting, it would be insufficient to affect the election. The mass of voters, as we have seen, had a fair oppor-

3. Declared result; rule.    tunity to vote; and unless a number of voters had been prevented from voting, sufficient to have varied the result, the election must stand. (McCrary on Elections, §§ 416, 425; *The State v. Mason,* 14 La. An. 510; *Augustin v. Eggleston,* 12 id. 366; Cooley's Const. Lim., 5th ed., 781.)

It is next claimed that illegal votes were received at the Dodge precinct sufficient to destroy the integrity of the poll, or at least sufficient to change the result of the election. From the testimony, it appears that at that time Dodge City was an outpost of civilization, and that in it there was a con-

siderable number of the transitory and rough element which is to be found in most of the frontier towns.    It is probably true, too, that the greater number, though not all, of that class favored the people's ticket.    That there were some illegal votes cast and some repeating done at that poll, is shown in the testimony; but that any of these illegal votes were cast with the connivance or knowledge of the election board, is not sustained by the evidence.  A reading of all the testimony convinces us that the judges carefully and conscientiously performed their duty.   Neither dishonesty nor incompetency can be imputed to any of them.   They were before the court and gave oral testimony, and we were impressed with the candor and truthfulness of their statements.   If there were grounds for the belief that they had knowingly permitted illegal votes to be cast, or by their negligence and inefficiency allowed illegal voting, thus rendering the result uncertain, we would not hesitate to strike out the entire poll of that precinct. It appears, however, that there were numerous challenges made during the day by the friends of the several candidates, and these were properly investigated and disposed of by the board.   They rejected those challenged who were not qualified electors; and in one case they detected a man whom they thought was attempting to vote a second time, and on their own motion ordered his arrest.   In no part of the evidence do we find anything which leads to the belief that they were guilty of either intentional neglect or wrong-doing.

The plaintiff sought to show a sufficient number of illegal votes to change the declared result.   We are satisfied from the evidence, as has been said, that some men voted who were not entitled to vote, and probably some voted more than once, but it does not satisfactorily appear for whom or at whose instance the illegal votes were cast.   Indeed, a great deal of what is termed direct evidence of illegal voting, taken by the commissioner, is incompetent.   Much of it is in regard to what the witnesses stated that others had said about illegal voting, and the number of times that they had voted.   It has been declared that testimony of

4. Illegal voting; incompetent evidence.

this character is hearsay, and cannot be considered. (*Gilleland v. Schuyler*, 9 Kas. 582.) Some of those who stated that they had been offered or given money to vote were prevented by the challengers and election officers from so doing, and in but few instances does it appear for whom the illegal votes were cast.

"It has always been held, and is not disputed, that illegal votes do not avoid an election unless it can be shown that their reception affects the result; and where the illegality consists in the casting of votes by persons unqualified, unless it is shown for whom they voted it cannot be allowed to change the result."

(*The People v. Cicott*, 16 Mich. 283; *Sudbury v. Stearnes*, 21 Pick. 148; *Trustees v. Gibbs*, 2 Cush. 39; *Ex parte Murphy*, 7 Cow. 153; *The People v. Tuthill*, 31 N. Y. 550; Brightly's Leading Cases on Elections, 454; *Deloatch v. Rogers*, 86 N. C. 357; *Judkins v. Hill*, 50 N. H. 140; Cooley's Const. Lim., 5th ed., 780.)

If all the illegal votes shown by legal proof to have been cast were subtracted from the vote of the defendant, they would be insufficient to overcome the plurality which he received, and there is no contention by plaintiff, as we understand him, that he has shown by direct evidence specific cases of illegal voting sufficient to change the result. He however claims to have shown by another species of evidence, that enough illegal votes were cast to overcome the plurality of one hundred and twenty-six, which were credited to the defendant on the returns. He offers in evidence the vote of that precinct on former elections, as well as the registration lists and subsequent votes of Dodge City and other portions of the territory which constituted Dodge City precinct at the time of the election in 1885. He produces citizens who attempt to identify the voters whose names appear upon the poll-list of the election of 1885, and when this is done, three hundred and forty-eight of the names appearing upon the poll-list of the election of 1885 are unaccounted for, and he claims that he has thereby shown that that number of illegal votes

were cast.   Testimony of this character is admissible, and may be received for what it is worth, but it is far from being satisfactory or reliable.   It is entitled to much less force and weight in a new country containing a shifting and unsettled population, and where a large immigration is pouring in, than in an older portion of the country where the population is more settled and stable.   The weakness of such testimony is well illustrated in the present case.   This contested precinct was a very large one, being eighteen miles in length and eighteen miles in width, and the city of Dodge was included within its limits.   It appears that there was a large influx of population into western Kansas in the year 1885, and that Ford county received its proportion of the same.   We refer to the following facts as showing something of that increase.   In Ryansville precinct of the same county, fourteen votes were cast in 1884, and in 1885 there were one hundred and thirty-seven polled; in Howell precinct twenty-nine votes were cast in 1884, and in 1885 there were fifty-nine cast; the vote in Speareville precinct in 1884 was one hundred and thirty-nine, and in 1885 it was two hundred and forty-eight.   The vote of Dodge precinct in 1884 was about five hundred and twenty-five, and in 1885 there were cast for the office of sheriff ten hundred and seventy-six votes.   It will thus be seen that the ratio of increase in Dodge precinct was no greater than in other precincts of Ford county.   Then, again, it appears that in Dodge precinct, and outside of the corporate limits of Dodge City, there were between six and seven hundred heads of families that had located upon public lands; and from the certificate furnished by the United States land office, it appears that there were nine hundred and two final entries of public lands in Ford county between the first of March, 1885, and the first of March, 1886.   One witness testified that he had between forty and sixty thousand acres of the public lands within that precinct fenced, and until the first of March, 1885, there were but two settlers inside the inclosure; but the land was ordered to be thrown open, and within thirty days after March

*5. Testimony, admissible, but not very reliable.*

1, 1885, there were nearly two hundred settlers upon that tract of land. In regard to the registration list, which has been compared with the poll-list of 1885, it seems that Dodge City was organized as a city of the second class in March, 1886, and the registration books were opened preparatory to the city election on the 23d day of March, and remained open only seven days. It is in testimony that a doubt existed among the voters of the city with regard to the necessity of registration, some believing that no registration was required. As a result of the shortness of time, and the doubt and prejudice which existed concerning registration, many failed to register. That the registration was then regarded as incomplete, is shown by the fact that the books were again opened for the bond election held the latter part of the same month. The census rolls referred to are shown to be equally incomplete. In regard to the identification by witnesses of the names found upon the poll list of 1885, it may be remarked that the attempt was made several months after the election occurred. One witness, the county clerk, was able to identify nearly one-half of the voters as shown by the returns. Another witness was called, and he was able to identify two hundred and five of the names which the first witness failed to identify. Other witnesses were called who were able to identify a few of those not before identified, but these again were unable to identify many of those which had been previously identified. Possibly if other witnesses had been called many others of those found on the list might have been identified. The discrepancies in the identifications in the different witnesses make manifest of how little value such testimony is. The witness who identified the greatest number stated that the population of the precinct had almost doubled from 1884 to 1885; that there were many new-comers that he recognized by sight without knowing their names. Other witnesses stated that the great rush of immigration began in the spring of 1885, and continued during the summer of that year. That no more of the names were recognized or identified by these older citizens is not to be wondered at when the marvelous increase of pop-

ulation, the great scope of territory over which it was distributed, and its transitory character, are considered. As against the inference deducible from the identifications made, there is the fact that the election was in the main orderly and peaceable; the fact that the friends of the several candidates were on guard challenging those that were not deemed to be legal electors; the fact that the one who was challenging in behalf of the plaintiff as well as himself challenged as many as one hundred persons during the day; the fact that none of the challenges were disregarded, and that the officers caused the arrest of illegal voters; and the further fact that the votes were received by election officers whose conduct is unimpeached, who saw the voters in person, and in receiving their votes acted publicly in the presence of the candidates and their friends. The votes were received and counted by the judges in the performance of a sworn duty, and the presumption arises that every ballot which was received and deposited in the ballot-box is a legal vote until there is evidence to the contrary. It has been said that —

"An election honestly conducted under the forms of law ought generally to stand, notwithstanding individual electors may have been deprived of their votes, or unqualified voters been allowed to participate. Individuals may suffer wrong in such cases, and a candidate who was the real choice of the people may sometimes be deprived of his election; but as it is generally impossible to arrive at any greater certainty of result by a resort to oral evidence, public policy is best subserved by allowing the election to stand, and trusting to a strict enforcement of the criminal laws for greater security against the like irregularities and wrongs in the future." (Cooley's Const. Lim. 782.)

The plaintiff questions the validity of the election, and charges that illegal votes were cast, and it devolves upon him to prove the charge. In this we think he has failed, and judgment must therefore be given in favor of the defendant.

6. Fraud — burden of proof.

The cases of *L. W. Cherrington v. J. G. Jerningan; R. Gaede v. S. Gallagher jr.; E. J. Beard v. Charles Van Tromp,*

are similar in character to the one we have been considering. They have been brought to try the title of the parties thereto to other county offices that were voted upon at the same election, and under an agreement all of the cases were submitted together, and are to be determined and disposed of upon the testimony taken in the case of *Tarbox v. Sughrue.* It follows that judgment must go in favor of the defendant in each case.

VALENTINE, J., concurring.

HORTON, C. J.: I do not agree with the conclusions of fact of the majority of the court concerning the illegal votes cast at the Dodge City election precinct.