THE STATE OF KANSAS, *on the relation of S. B. Bradford, Attorney General*, v. J. R. STOCK, *et al.*

### *Motion for Rehearing.*

On December 13, 1887, the defendants filed a motion for a rehearing, which the court overruled, at its session in February, 1888, and then filed the following opinion.

*Per Curiam:* Upon the motion for rehearing, the principal questions presented were, first, that the judgment of *Hammond v. Garner*, rendered May 31, 1878, was a final determination of the matters involved in this case, and that the court in its judgment must have overlooked the provisions of article 7, ch. 36, Comp. Laws of 1885; second, that under the pleadings,

the illegal votes cast in favor of La Crosse cannot be impeached or excluded.

In *The State v. Comm'rs of Hamilton Co.*, 35 Kas. 643, being a proceeding to determine the county seat of that county, this court said:

"This action was prosecuted in the name of the state of Kansas by the attorney general, who has the right to prosecute and defend in the name of the state and for the state, and the state unquestionably has the right to require that all county officers shall hold their offices at the county seat; and we know of no other plain and adequate remedy which the state may resort to for this purpose."

The contention in that case was, that the legislature intended by §113, ch. 24, Comp. Laws of 1885, to give any person interested the right to contest the election for the location of the permanent county seat, and thereby to designate the proceeding and the tribunal in which the validity of such an election should be tried and finally determined; and in the argument it was said if this were not the correct conclusion, the proceeding would be an idle and useless ceremony. It was held unanimously by this court that the authority granted to a private citizen in no way interfered with the legal rights or powers of the state, and that the state, in its sovereign capacity, apart from and independent of that section, had the power to go into the courts and have a judicial determination where the county seat of a county was in fact and law located. We think the clear implication of that decision is, that if any private citizen had contested the election as to the permanent location of the county seat prior to the commencement of that case in this court, the proceeding would not have been *res adjudicata* as to the state; yet under §113, the court is given authority to try and determine the validity of an election called for the permanent location of a county seat. It is strenuously urged, however, that because the Hammond case was prosecuted under the style of "The State of Kansas, upon the relation of Daniel Hammond," that therefore it finally settled the county seat of Rush county; and that the state of Kansas has no

right to make further inquiry. If such a construction be given to the statute, then the state of Kansas is without remedy to go into the courts and have a judicial determination as to the location of a county seat, if some elector has obtained judgment under art. 7, ch. 36. In other words, the contention of the defendant is in substance that the provisions of art. 7 oust the courts of all jurisdiction to hear and determine the location of a county seat at the instance of the state in its sovereign capacity, if proceedings have been commenced by an elector under said art. 7. We cannot discover that a judgment rendered in a contested county-seat case under said art. 7, ch. 36, is any broader or more conclusive than a judgment rendered under § 113, ch. 24, Comp. Laws of 1885. The Hammond case, having been brought in the name of the state upon the relation of a private citizen, did not add anything to the force of the judgment; and certainly it cannot be claimed with reason that the state was thereby a party interested, or had any authority, through its attorney general or otherwise, to control or supervise the litigation. Hammond was not a public officer; was not under official oath; and was only permitted by the statute to prosecute his action because he was " *an elector who considered himself aggrieved.*" (Comp. Laws of 1885, ch. 36, art. 7, § 1; *Garner v. The State*, 28 Kas. 790.)

In most of the states it is the practice to have proceedings in mandamus prosecuted in the name of the state, or in the name of the people, upon the relation of a private party interested; but the decisions do not show that thereby the state becomes involved, or that the statute of limitations cannot be invoked.

In Iowa, it was formerly held that proceedings in mandamus should be conducted in the name of the state, upon the relation of the informant, when the object sought was to enforce a duty for mere private ends. (*Chance v. Temple*, 1 Iowa, 179.)

In Ohio, the writ of mandamus issues in the name of the state, upon the information of the actual party in interest. (*The State v. Commissioners*, 5 Ohio St. 497.)

In Illinois, proceedings in mandamus are issued in the name of the people, upon the relation of the person interested having some right to enforce. (*The People v. Board of Supervisors*, 47 Ill. 256.)

In all the states wherein the proceeding in mandamus is prosecuted upon the relation of a private party, although the name of the state or the people is also used, such a proceeding is treated and considered a private or personal action, and the maxim, *Nullum tempus occurrit regi*, has no relevancy.

In the Hammond case, the state of Kansas was not the real party to the proceeding; it was not asserting any right, and was not before the court. The application in that case was by a private individual who "considered himself aggrieved," and it was upon his application alone that the judgment was rendered. Section 4 of said article 7, chapter 36, expressly states that the elector shall be liable for costs. While Hammond was expressly authorized by the statute to maintain his action, it was, as we have before remarked, as much of a private or personal action as one instituted by an interested person under said § 113, ch. 24. Said § 113, ch. 24, does not give to the state of Kansas any remedy to compel the county officers to hold their offices at the place where the county seat is in fact located; nor does said art. 7, ch. 36, give to the state in its sovereign capacity any remedy to compel the county officers to hold their offices at the county seat. Both of the statutes named are special statutes, whereby parties interested or aggrieved may have their grievances redressed. Prior to the adoption of these and similar statutes, this court held that mandamus would not lie at the suit of a private citizen, where the citizen showed no specific or peculiar interest in himself different from that shared by the public at large. (*Bobbett v. The State*, 10 Kas. 9; *Turner v. Comm'rs of Jefferson Co.*, 10 id. 16; *Reedy v. Eagle*, 23 id. 254; *Adkins v. Doolen*, 23 id. 659.) Under these statutes, parties alleging themselves interested or aggrieved are permitted to institute proceedings without showing that they have any peculiar or special interest in the result.

It is true that we held in *Garner v. The State*, supra, that Garner could not again litigate the matter, because he had had his day in court, and therefore was in no condition to treat the Hammond judgment as a nullity. We intended, in that case, by the language employed, to intimate that the state, upon the relation of the attorney general, had full authority to go into the courts and make inquiry as to the county seat of a county; and, if necessary, to have a judgment rendered in favor of a private citizen, under the provisions of said art. 7, chapter 36, reviewed and superseded. If the case of *Garner v. Moon* were to be construed as contended for by the defendants, we would unhesitatingly overrule the decision, because it would be wrong in principle, pernicious in results, and grossly unjust to the public. This case is a strong illustration of the injustice that might be accomplished, if proceedings under said article 7, chapter 36, were *res adjudicata* against the state.

Upon the testimony in the record, the people of Rush county voted, on February 12, 1878, for Walnut City as the seat of justice. In the Hammond case, Garner made no return or answer, and judgment was rendered against him upon default. If that decision be final, then without any investigation of the poll books, tally sheets, or ballots, indeed without any evidence whatever, but solely upon the neglect or misconduct of Garner, the county seat was changed from Walnut City to La Crosse. In all fairness and common honesty, ought a judgment rendered as that one was to be forever binding and conclusive upon the public and the state? We think not. No statute should be construed to permit such an iniquity, unless the language imperatively demands such an interpretation. Neither the superior rights of the state nor the supreme rights of the people should be permitted to be frittered away by the neglect of any private person, or public officer, if a reasonable construction of the statute will forbid such a result. The construction given to said article 7 by the counsel for the defendants not only deprives the state of its sovereign power, but permits county seats to be located hither and thither

at the instance or by the neglect of private parties, regardless of the rights of the state, or the expressed will of the people. Such a conclusion would, in many counties, cause confusion to reign worse confounded.

Further, the actions of Hammond and Moon were against Garner, who was only a county clerk; he had no control of the county funds, or of county affairs; he had no county money with which to defend, or with which to employ counsel. How can it be said that the judgments rendered against him in those cases are conclusive against every other officer of the county? If so, upon what grounds? (*A. T. & S. F. Rld. Co. v. Comm'rs of Jefferson Co.*, 12 Kas. 127.) Garner was only a representative of the county in a special or limited degree. He was not such a representative, or agent, as the board of county commissioners of a county. By express provisions of the statute, the county commissioners are authorized to represent the county and have the care of the county property and the management of the business and concerns of the county. They are also authorized to purchase sites for and to build and keep in repair the county buildings; and to provide suitable rooms for county purposes. The county commissioners furnish the office or room for the county clerk; and also all his books and stationery. If the actions of Hammond and Moon had been prosecuted against the board of county commissioners of Rush county, then within the authorities, the citizens of the county might have been bound thereby, if the judgments were *res adjudicata* against the state. (*Comm'rs of Morris Co. v. Hinchman*, 31 Kas. 729; *Sabin v. Sherman*, 28 id. 289; *Clark v. Wolf*, 29 Iowa, 197.)

If the other officers of Rush county were not bound by the judgments against Garner, then the state is not estopped thereby. If all parties, including the state, the county officers, and the citizens of Rush county, were not forever foreclosed by the Hammond case, it is an additional argument favoring the power of the state, upon the relation of the attorney general, to have the judgments rendered against Garner reviewed and superseded by a general adjudication as to which city is the

legal county seat of Rush county, and by such a proceeding
to have all the county officers brought together, with their
books, papers and records, to one city as the county seat.  It
was urged, however, that the citizens of Rush county and the
friends of Walnut City are bound by the Hammond case, be-
cause they defended the case over the shoulders of Garner,
the county clerk.  As before remarked, there was no proper
defense in that case; and therefore in fact, there was no legal
battle over the shoulders of any officer, public or private.  The
judgment went by default.  It was clearly intimated in the
Moon case that the judgment was irregular.  Because Garner
never made any defense, nor took any steps to have the judg-
ment set aside, or reversed, we held the judgment binding as
to him.

Concerning the admission of the evidence impeaching votes
cast for La Crosse, a few words only are necessary.  Before
all the evidence was taken, the following notice was served
by the plaintiff upon the defendants:

"You, and each of you, are hereby notified that at the trial
of this case the plaintiff will offer and rely on all the testi-
mony heretofore taken, and that may be hereafter taken in
this case, tending to show the illegality of the votes cast and
counted in favor of La Crosse for county seat of Rush county,
Kansas, at Liebenthal precinct, the same being precinct No. 5,
by the following named and numbered witnesses and persons
as they appear upon the poll book of said precinct, to wit:
No. 24, Jacob Munch; No. 26, Joseph Munch; No. 22, Adam
Bieker; No. 27, Franz Dreher; No. 25, Conrad Dehn; No.
31, Conrad Bieker; No. 19, Nicholas Bieker; No. 21, C. Her-
klotz; No. 7, John Dreher; No. 31, Nicholas Waltschmidt;
No. 34, Peter Werth; No. 35, Jacob Zimmerman; No. 33,
Frederick Werth; No. 28, John Werth; No. 32, Jacob Her-
man; No. 36, Carl Werth; No. 9, Andrew Weber; No. 38,
Anton Depperschmidt; No. 5, John Kreitzer."

This notice gave the defendants a reasonable length of time
in which to rebut the testimony produced to support its state-
ments.

This case does not come here by appeal, or on error.  Be-
ing an original action, the pleadings may at any time, in the

furtherance of justice, be amended. Therefore if under the pleadings the evidence of the illegal votes cast for La Crosse was inadmissible, the pleadings, upon the facts disclosed in the testimony, might be considered as amended. We think, therefore, as stated in the original opinion, that "all evidence tending to show fraudulent practices by illegal votes cast for, and legal votes rejected for both places, was admissible."

We have again carefully examined all of the testimony of the illegal votes cast for Walnut City and La Crosse. Resolving every reasonable doubt in favor of La Crosse and against Walnut City, it clearly appears that more illegal votes were cast at the election of February 12th, 1878, for La Crosse, than for Walnut City. If the illegal and fraudulent votes are not counted, Walnut City received a majority of the votes for county seat.

The date of "February 25th, 1878," as employed in the opinion, is severely criticised. It is said that the court tries to make February 25th, 1878, come before "New Year's Day, 1878." An examination of the briefs shows that the defendants contended that McFadden sr. was not a qualified voter on February 12th, 1878. There is sufficient evidence in the record tending to show that McFadden sr., who was a widower, came to Rush county in the summer of 1877, with the intention of locating there; and that his return to Pennsylvania on October 9, 1877, was merely temporary. At least, there is sufficient evidence in the record to show that he was a legal voter at the time of the county-seat election. It was the intention to state in the opinion that the evidence of James Baker was in conflict with the evidence of James McCall, and that he disposed of the latter's testimony. The date of February 25th, 1878, is not material.

Again, as the vote of McFadden sr. was received and counted by the judges of the election, in the performance of a sworn duty, the presumption arises that his ballot, which was received and deposited in the ballot-box, was a legal vote, until there is evidence to the contrary. (*Turbox v. Sughrue*, 36 Kas. 225.) The defendants obtained a subpena for McFadden sr.; they

put it in the hands of one of the defendants, the sheriff, for service; it was not served, nor does the sheriff or any other of the defendants give any reason therefor. It seems to be admitted that McFadden sr. continues to be a resident of Rush county.

Counsel urge that it is a great hardship upon the people of Rush county to have the county-seat question reopened, and to require the officers of the county to hold their offices at Walnut City, a distance from La Crosse of four miles; and appeal to this court, in the exercise of its discretion, to refuse the peremptory writ. It cannot fairly be said that the judgment of this court in this case was the sole cause for the opening up of the county-seat fight, because contention over that matter has been incessant in Rush county for years. The efforts made in various ways to ignore the county-seat question have failed. It is true that the plaintiff states in its application that the officers of Rush county removed their offices to La Crosse in November, 1882. This action was commenced in 1886; therefore, for a time, there was a seeming recognition of La Crosse as the county seat by the officials of the county; but the elections in the county continued to turn upon the question whether La Crosse or Walnut City was rightfully the county seat. "Banquo's ghost would not down." At three different times since February 12, 1878, the friends of La Crosse have presented petitions to the board of county commissioners of Rush county, praying for elections to relocate the county seat. One of these petitions was headed by J. R. Stock, a defendant in this case, and this petition was not presented until October, 1878, after the judgment rendered in the Hammond case. At that time, this defendant and the friends of La Crosse did not understand that the Hammond case ended the controversy over the county seat. According to the briefs of the defendants, filed upon the motion for rehearing, the last election to relocate the county seat was held quite recently.

We have already decided that the statute of limitations cannot be invoked in this case; and as it appears from the

testimony that Walnut City was chosen as the seat of justice of Rush county by the majority of the legal votes on February 12, 1878, we cannot, in the absence of sufficient evidence, change the county seat as located by the people, or refuse to compel the defendants to keep their offices where the law requires them so to do. If, however, the people of the county desire the county seat to be changed to La Crosse, the statute offers a complete remedy. Under an election properly called and conducted, if the people of Rush county vote for La Crosse in accordance with the provisions of the statute, the county seat may be taken to that place notwithstanding the election of February 12, 1878. The whole matter is in the hands of the people of Rush county, and to them it is remitted.

In the examination of the questions presented upon the motion for a rehearing, we have given the authorities and the testimony our careful and conscientious attention. We have reached our conclusions only after mature deliberation. We are satisfied with the law as declared in the former opinion, but as this is a "county-seat fight," if the court could speak with the tongues of angels and with all knowledge, and all prophecy, its decision would not be satisfactory to all the contesting litigants.

The motion will be overruled, and the peremptory writ will issue as heretofore directed.

JOHNSTON, J., dissents.