B. F. BLUE v. HENRY PETER.

1. ELECTION — *Contest—Spurious Ballots.* Where the judges of an election receive a large number of illegal votes, and cause fictitious names to be placed on the poll-books and put spurious ballots in the ballot-box, the returns from that precinct should be rejected.

2. ———— *Evidence of Fraud.* In the trial of a contest between two candidates for the same county office, evidence that they were the candidates of two rival cities and different parts of the county is admissible when fraudulent voting is charged at the voting-place of one of the cities, as tending to show motive for such fraud.

3. ———— *Corruption of Judges.* It is not necessary to connect a contesting candidate with the malconduct of the judges of election at a precinct where he received illegal votes; it is enough to show that they conducted the election corruptly, without reference to any connivance of the candidate.

4. ———— *Hearsay Evidence.* On the trial of a contested election, evidence of what others said to the witnesses after election, of what they did at and before the election, is hearsay, and incompetent.

5. ———— *Hearsay Evidence.* Proof of rumors that certain persons who have been resident electors of a precinct had moved away is hearsay, and inadmissible.

6. ———— *Poll-Books as Evidence.* Poll-books of recent prior elections and the last assessor's return of male residents of the township over twenty-one years of age are competent evidence in a contest court.

7. ———— *Question at Issue.* In the trial of a contested election the question to be determined is, Who received the highest number of legal votes for the office in dispute? and if that question can be decided from the competent evidence introduced, then any errors of the contest court must be deemed to be immaterial.

8. ———— *Misconduct of Judges — Evidence.* The assessor's return of male residents of a township on the 1st day of March, 1887, contained 417 names; the poll-book of a special railroad election on July 9th shows 609 votes cast, and at the general election in November of the same year 612 votes were polled. It appears that 222 names were on the poll-book of November not found on that of the July election, and 219 on the July list not on that of November; and 261 names appear upon the November poll-book not found on the assessor's roll. This evidence was supplemented by the testimony of the old settlers of the township that they did not know of a large number of persons whose names appeared on the poll-books of the general election. No proof was offered to show why there was so

great and rapid a change of the voting population of the township. *Held,* Such evidence is sufficient to sustain a finding of malconduct of the judges of election, and a judgment rejecting the returns from the township.

*Error from Harper District Court.*

AT the general election held in Harper county on November 8, 1887, the plaintiff in error, *B. F. Blue,* and the defendant in error, *Henry Peter,* were the opposing and only candidates for the office of register of deeds.   The board of county commissioners of Harper county at the time prescribed by law made a canvass of the election returns, found that there were 1,569 votes cast for Blue and 1,522 for Peter, and determined and declared that Blue, having received the highest number of votes, was duly elected register of deeds for the ensuing term; and the county clerk of said county issued a certificate of election to him.   On the 28th day of the same month, Peter filed a statement of his intention to contest the election of Blue.   On the next day, Hon. A. H. Adams, probate judge of Harper county, selected H. T. Purcell and Robt. P. McColloch to act with him as judges of a contest court for the trial of the case; the trial was commenced on the 21st of December, 1887, and continued until January 20, 1888.   The court found and adjudged that Henry Peter, the contestor, was elected to the office of register of deeds, and rendered judgment in his favor.   Blue excepted to many of the rulings, and to the judgment of the contest court, and by petition in error carried the cause to the district court, where it was affirmed.   This action is brought to reverse the judgment of the district court.   The findings of fact and conclusions of law of the contest court are inserted here in full:

"FINDINGS OF FACT.

"1. On the evening of the 7th of November, 1887, W. W. Kettleman was approached by George King, trustee of Harper township, and requested by said King to act as one of the judges of election to be held in Harper City and township on November 8, 1887.   On the afternoon of November 7, 1887, F. D. Schermerhorn was approached by the said George King, trustee of Harper township, and spoken to by said King in

regard to acting as one of the judges of the election to be held in said city and township of Harper on said 8th day of November, 1887. On the morning of the 8th day of November, 1887, G. E. Maxwell is seen by H. C. Maxwell and informed that he is wanted to act as one of the judges of said election. Thus were the judges selected. B. E. Crosslin, an employé of L. H. Hutchinson, and C. B. Collins, acted as clerks. The judges and clerks were first sworn by J. G. Washbon, police judge, and afterward by J. J. Merrick, justice of the peace.

"2. The election was held in a room in the Glenn House, in the city of Harper, said room being occupied by F. D. Schermerhorn as an office. The window at which the ballots were received was raised, and a board was placed beneath so as to partially obstruct the view from the street. An opening ten inches wide was left at the west end of the board. Through this opening the ballots were received. No challenges were made, no questions asked, and no ballots refused by the judges during the entire day. The polls were kept open until twenty minutes of seven o'clock P. M. Immediately after the close of the polls, George King, trustee of said Harper township, was requested by all the members of said election board to be present, and remained with them all night, and until the ballots were counted and the result declared on the morning of November 9, 1887.

"3. A few days prior to the 8th day of November, 1887, W. M. Drewer, a citizen of Harper county, Kansas, and railroad master on the Santa Fé railroad west of Wellington, went to Wellington, and in an interview with J. G. Meenan, boss of the extra gang, comprising about 75 men, in the yards of the S. K. railroad at Wellington, Sumner county, informed Meenan that he wanted about 30 men to go from Wellington, Sumner county, Kansas, to Harper City, Harper county, Kansas, for the purpose of having them vote at the election to be held in said city of Harper on November 8, 1887. A day or two later W. M. Drewer interviewed J. G. Meenan at Wellington again. This time he is accompanied by L. H. Hutchinson, a grain merchant of the city of Harper. Hutchinson tells Meenan that he, Hutchinson, wants about 30 men to go from Wellington to Harper to vote at the election to be held in said city of Harper on the 8th day of November, 1887; he, Hutchinson, promising that the men should be paid for the time lost in laying off that day, and that their expenses to Harper and back should be paid. In pursuance of this offer

W. M. Drewer gives to the said Meenan, at the Arlington hotel in Wellington, the sum of $100. Out of this $100, Meenan gives $75 to George Ingram, Joseph Cristler, Lon Martin and —— McNaught, and the balance of $25 he paid to William Williams, John Massey, Roy Hankler, W. A. Myers, Robert Everly and eleven others. L. H. Hutchinson is in Wellington on the morning of November 8th, 1887. A train leaves Wellington for Harper early the same morning. Meenan goes to Harper on that train. In Harper he sees McNaught, Lon Martin, Joseph Cristler, George Ingram, John Massey, Isaac Cristler, William Williams and L. H. Hutchinson. Twenty-two of the extra gang go to Harper on the said 8th day of November, 1887. Near the depot in Harper City they are met by Mr. Murphy, who introduces himself as the man appointed to receive them, and by him conducted by a back way into the rear end of L. H. Hutchinson's wareroom. Here they are furnished with all the liquor and cigars they desire. Tickets are handed them by the said Murphy, and then in squads of two, three and four they are conducted to the polling-place by Murphy. When the sidewalk at the polling-place is reached Murphy precedes the men a few steps, and when he arrives directly in front of the opening through which the ballots are received raises his hat, passes on, and immediately after the men from Wellington walk to the opening, hand in their ballots and either give their own or an assumed name, and walk away, no questions being asked them by the judges within.

"4. After the filing of the statement of intention to contest said election, and a few days prior to the time of taking depositions at Wellington, Sumner county, Kansas, to be used in the trial of this case, L. H. Hutchinson and W. W. Clark, both residents of Harper City, Harper county, Kansas, go to Wellington, Sumner county, Kansas, and calling together the men of the extra gang who had gone from Wellington to Harper to vote on November 8, 1887, state that they, Hutchinson and Clark, desire to get them away from Wellington so their depositions could not be taken. To this end Hutchinson and Clark offer to pay the fare of the men to Kansas City. The offer is rejected. Hutchinson and Clark then offer to give the single men $10 each and the married men $20 each to go to Kansas City and remain until after the time for taking their depositions has elapsed. This offer is also rejected, and the men remain in Wellington.

"5. The judges of said election caused and procured the

clerks of said election to write upon the poll-books of said election the names of 112 fictitious persons, and the judges placed or caused to be placed 112 tickets or ballots in the ballot-box of said election, to correspond with the 112 fictitious names placed upon said poll-books by said clerks.

"6. The judges of said election caused and procured the clerks of said election to write upon the poll-books of said election the names of 47 persons who were either residents of said Harper City or township, but who were absent from said city and township on said 8th day of November, 1887; or who had at one time resided in said city or township of Harper, but who had removed from said city or township of Harper prior to the 8th day of November, 1887; or who were residents of said city or township of Harper, but who did not vote on said 8th day of November, 1887; or who, being residents of said Harper City or township, were permitted by said judges to vote a second time, or whose names were placed upon the poll-books a second time by the clerks of said election under the direction of said judges; and said judges placed or caused to be placed 47 tickets or ballots in the ballot-box of said election, to correspond with the 47 names so placed upon said poll-books.

"7. The judges of said election received the tickets or ballots of 42 illegal voters and placed or caused to be placed said 42 illegal ballots in the ballot-box of said election, and caused or procured the clerks of said election to write the names of 42 persons upon said poll-books to correspond to the said 42 illegal ballots or votes so received by said judges.

"8. The poll-book returned from Harper City and township purports to show that 612 votes were cast in said precinct. It also purports to show that of this number 607 voters recorded their choice in favor of said B. F. Blue for said office of register of deeds, and one voter his choice in favor of Henry Peter for said office. Outside of the poll-book there is no evidence to show how many voted or how many were legal voters. Some of the witnesses have testified that they voted there, but there is no evidence to show for whom they voted.

"9. On the 8th day of November, 1887, the township of Lake, Harper county, Kansas, constituted one election precinct. Prior to the 8th day of November, 1887, the trustee and one of the justices of the peace of said township issued a proclamation establishing two polling-places in said election precinct. Two polling-places were opened in said precinct on said 8th

day of November, 1887: one at the residence of Edward Wallace, at which place the election was presided over by J. H. Anderson, trustee of Lake township, R. H. Boyd, and Edward Wallace, and the other at the Joppa school house, at which place the election was presided over by F. P. Melvin, Isaac Plumly, and M. S. Neighbor. Of the elections thus held in said precinct, poll-books were returned to the county clerk of Harper county indorsed as follows: 'Poll-book of the election held in the north precinct of Lake township in the county of Harper on the 8th day of November in the year one thousand eight hundred and eighty-seven,' and the other, 'Poll-book of the election held in the E. P. township of Lake in the county of Harper on the 8th day of November in the year one thousand eight hundred and eighty-seven.'

"10. In the township of Ruella, Harper county, Kansas, one illegal vote was cast for Henry Peter for said office of register of deeds.

"11. Rejecting the returns from the Harper precinct, the returns from the E. P. township of Lake, and the one illegal vote cast in the Ruella precinct, the court finds that the total number of votes cast in Harper county, Kansas, for the said Henry Peter, contestor for the office of register of deeds for said Harper county, Kansas, to be 1,520, and that the total number of votes cast in Harper county, Kansas, for the said B. F. Blue, contestee, for said office of register of deeds, to be 917, and that said Henry Peter did receive a majority of 603 of the legal votes cast at the election held in said county, on the 8th day of November, 1887."

"CONCLUSIONS OF LAW.

"1. Section 3 of the election law (General Statutes, p. 391) provides that the trustee and any two justices of the peace shall be judges of all elections in their respective townships; that they shall have power to appoint two clerks for such election; that if said judges of such an election, or either of them, fail to meet at the place of holding the election by the hour of 8 o'clock A. M., then the electors present shall select from their number, *viva voce*, one or more judges of the election, as the case may be, who shall have all the powers and authority of the judges herein mentioned.

"Our conclusion of law from the first finding of fact is, that while the judges of the election held at the Harper precinct were not the officers designated by law to be the judges, and while they were not selected by the electors present from their

number, yet they were officers *de facto*. They, with the clerks selected by them, formed an election board. They were recognized as such by the persons voting there that day, and the manner of their selection was merged in the assumption by them of the powers belonging to judges of election, and the public recognition and acquiescence in the acts there done by them as judges and clerks *de facto*. The manner of the selection of the judges was an irregularity. While it was an irregularity, if it stood alone it would not in our judgment invalidate the election.

"2. The fact that the window where the ballots were received was arranged so that a full view of the interior of the room occupied by the judges and clerks could not be had from the street, is not of itself sufficient to charge the election board with fraud. Fraud will never be presumed. In the light of the testimony given by these judges upon the trial of this case, it may be a singular and significant fact that no challenges were by them made, that no questions were by them asked a single voter, and that no ballots were by them rejected, but this fact alone is not sufficient to charge them with having been parties to a conspiracy having for its object the casting of fraudulent and illegal votes. The keeping of the polls open until 20 minutes of 7 o'clock P. M. was an irregularity, but if standing alone it would not invalidate the election held in the Harper precinct. The calling into the room by the judges immediately after the polls were closed, of George King, the trustee, the fact that he remained there all night and until the result was declared, is a strong circumstance indicative of some fraudulent design on the part of the judges, and since no good reason is assigned why he was called in and remained, and since it is out of the ordinary practice of election boards, it is to our minds conclusive evidence that the intentions of these judges were not honest.

"3. Does the third finding of fact make, in law, an unlawful conspiracy? And does it make the judges and clerks parties to such conspiracy and participants in it? An unlawful conspiracy is defined to be 'a confederacy of two or more persons to accomplish some unlawful purpose, or a lawful purpose by some unlawful means.' (2 Bishop's Criminal Law, § 173.)

"'Such a conspiracy may, in the first instance, be established by evidence having no relation to the defendants, by acts of different persons at different times and places, by the writing and speeches of such persons, or by other circumstances

which tend to prove its existence.' (*Spies v. The People*, 122 Ill. 1.)

"'The conspiracy having been established *prima facie*, any act or declaration of a member thereof, whether a defendant or not, in furtherance of the common design, is evidence against all the defendants.' (Id.)

"We think that a *prima facie* case of an unlawful conspiracy is made in the third finding of fact. So far as the evidence discloses, Drewer, Hutchinson and Meenan were the first conspirators. The railroad men who accepted the offers made by Drewer, Hutchinson and Meenan, and who went to the city of Harper on the day of the election, are by this act parties to the conspiracy.

"Murphy is shown to be a party from the undisputed testimony of the Wellington men, themselves parties to the conspiracy, that he met them at the depot in Harper City, introduced himself as the person sent to receive them, that he took charge of them, furnished them with ballots, and led them to the polls. Whether or not the judges and clerks were original parties to the conspiracy, we cannot say; we think they were. The fact that they were appointed, and not elected; the fact that on the day of the election one of the appointed judges, Kettleman, who cannot distinguish between men without glasses, left his glasses at home—that he went home to dinner and returned to the polling-place without his glasses; the fact that a board was placed across the window where ballots were to be received; the fact that Crosslin, one of the clerks, was at the time in the employ of Hutchinson, one of the original conspirators, are strong circumstances to show that the judges or clerks or some of them were original parties to the conspiracy. But whether they were original parties or not, it is clear that there must have been some understanding between them and Murphy—there must have been a prearranged signal between them and him. By the recognition of the signal made by Murphy to them at the window, they must be charged with a knowledge of the conspiracy; and by the reception by the judges of the ballots of such Wellington voters as voted without challenge or question, and by the writing by the clerks of their names on the poll-books, the judges and clerks adopted the plans and purposes of the conspiracy, and thus became parties to it. We cannot believe from the evidence that these judges and clerks were incompetent, ignorant, or simply negligent. We cannot escape the belief that they permitted illegal voters to vote, and placed

the names of illegal voters on the poll-books, with full knowledge of what they were doing, with full knowledge of the conspiracy, and in furtherance of the design of such conspiracy.

"4. 'The return of a vote of a given precinct, made in due form and signed by the proper officers, is the best evidence of the state of the vote of that precinct. Yet this return may be impeached on the ground of fraud or misconduct on the part of the officers of the election themselves, or on the part of others. In election cases, before a return can be set aside there must be proof that the proceedings in the conduct of the election, or in the return of the vote, were so tainted with fraud that the truth cannot be deduced from the returns.' (McCrary on Elections, § 436, p. 370.) This rule here laid down is followed and affirmed by the supreme court of this state in 35 Kas. 640, in the case of *The State, ex rel., v. Comm'rs of Hamilton Co.* With this rule before us we come to a consideration of our fifth finding of fact. It is proved that 112 fictitious names appear upon the poll-books of Harper precinct, and that 112 spurious ballots were deposited in the ballot-box. As is said by our supreme court in 11 Kas., in the case of *Russell v. The State*, p. 247, so we say here: 'It is not possible that this could have happened without the knowledge, consent and connivance of both the clerks, and some, at least, if not all the judges. This falsehood cannot have been the result of ignorance or mistake. Surely there was criminal culpability, if not actual intentional wrong-doing on the part of all the officers of that election board.' This proof destroys the *prima facie* character which attached to the poll-books as evidence of the results of the election held there and the number of votes cast. The true state of the vote of the Harper precinct cannot be deduced from the return. The returns and the declaration of the canvassing board must be wholly ignored by this court, and not considered as any evidence in determining the result of the election in said precinct.

"5. Following the rule laid down by Judge McCrary, and adopted and affirmed by the supreme court of this state, and applying that rule to our sixth and seventh findings of fact, we must conclude that the proceedings on the part of the election board, in the conduct of the election, are so tainted with fraud that the *prima facie* evidence which attached to the poll-books as evidence of the results of the election held there that day, is destroyed; the integrity of the poll-book is again impeached, and we think that the language of the supreme court

of this state, quoted by us above, applies as well to our sixth and seventh findings of fact as it does to our fifth finding of fact.

" 6. Our conclusion of law from our eighth finding of fact, is that the state of the vote of the Harper precinct rests upon the record of the poll-books of said precinct, and upon it alone. By the record of that poll-book it is said that the contestor in this action received one vote, and that the contestee in this action received 607 votes. But the contestor has proven that the record is false, and that it was manufactured in fraud; and that 201 names appear thereon which are the names of false, fraudulent, and illegal voters. The falsehood spoken by the poll-book cannot have been the result either of ignorance or mistake. It is absolutely certain that the names appear there by and with the consent, knowledge and connivance of both the clerks, and some, if not all, of the judges. With the poll-book thus impeached, and a fraud of this magnitude so clearly proven, no presumption in favor of the remaining portion of the poll-book can reasonably obtain. The contestee has asked us to reject the false, fraudulent and illegal votes, and take the balance of the votes shown by the poll-book, not proven to be false and illegal. We cannot do this. The record of the poll-book was made by the election board, with full knowledge that it was a false and fraudulent record. Had the legal electors of this precinct appeared in this court and testified that they voted in that precinct on the day of the election, and for whom they voted, we would have counted their votes and purged the poll. They had a right to do this. They did not do it. There is no evidence before us that any votes were legally cast; and we must find that the pretended election held in the precinct of Harper, in the city of Harper, in the county of Harper, state of Kansas, is void and should be set aside.

" 7. Our conclusion of law from our ninth finding of fact is, that on the 8th day of November, 1887, in the township of Lake, in the county of Harper and state of Kansas, there was but one legal and valid voting precinct; that the place legally designated to hold said election was at the residence of Edward Wallace, and presided over by J. H. Anderson, trustee of said township, R. H. Boyd and Edward Wallace, and that the legal election in and for said Lake township was there had and held; that the election held on the 8th day of November, 1887, in said township of Lake, Harper county, Kansas, at the Joppa school house, and presided over by F.

P. Melvin, Isaac Plumly and M. S. Neighbor, was an illegal and void election, and the returns thereof should not by us be counted.

"8. Our conclusion of law from our tenth finding of fact is, that the one illegal vote cast in the Ruella precinct does not affect the result, but it having been shown that the illegal vote was cast, and that it was counted for the contestor in this action, the poll of the Ruella precinct must be purged of the illegal vote, and the vote must be deducted from the whole number of votes received by the contestor in said Ruella precinct.

"9. Our conclusion of law from our eleventh finding of fact is, that Henry Peter, contestor in this action, did receive a majority of the legal votes cast in Harper county, Kansas, on the 8th day of November, 1887, for the office of register of deeds of said county, and that he was therefore duly elected to said office."

The judgment of the court was, that at the election held in Harper county, on the 8th day of November, 1887, *Henry Peter*, contestor in this action, was elected to the office of register of deeds for said county, and that *B. F. Blue*, contestee in this action, should pay the costs of these proceedings. Judge Purcell dissenting from the seventh conclusion of law, in reference to the ninth finding of fact.

*Shepard, Grove & Shepard, Finch & Finch*, and *Sam. S. Sisson*, for plaintiff in error.

*Hatton & Ruggles, H. C. Finch, Geo. E. McMahon*, and *W. S. Cade*, for defendant in error.

Opinion by Holt, C.: We shall not review the findings of fact and conclusions of law of the contest court in rejecting the returns from the east precinct of Lake township, although the briefs of the parties are full on that subject. It would not change the result of the election whether we approved or disapproved its judgment, owing to the number of votes cast there. We will state, however, that the election held there was apparently conducted in good faith, and after notice had been given of the places of voting, which the officers of the township believed to have been sufficient; there can be no im-

putation of unfair dealing cast upon the officers of Lake township, or the judges and clerks of election of that precinct.

Peter, in his contest, charges that there was a corrupt and fraudulent conspiracy of the judges of Harper township, between themselves and certain citizens of that township, to elect Blue, and for that purpose a large number of illegal votes were counted for him; that under their control the election was so fraudulently conducted that the entire poll should be thrown out. The contest court did reject the entire vote of that township. Peter offered a great volume of testimony to prove that there was a fraudulent election; he showed that on the morning of the election the township officers, who under the law would have been the judges, were absent from the polling-place, and the election board was organized by the election of officers from the bystanders. He offered evidence for the purpose of proving that during the day the judges procured, and permitted to be placed in the ballot-box of Harper township, 175 pretended ballots, and caused the clerks of said election to write upon the poll-books of said township 175 names; and that the ballots themselves were spurious, and the names were fictitious. He further charges, and offered testimony tending to prove, that there were 125 ballots deposited in the ballot-box for persons who had been residents of the township, but had moved away or were absent on election day; and that the clerks wrote down those names on the poll-books when the ballots were put in the ballot-box; and then again, that the judges received and counted for Blue for register of deeds about fifty votes cast by illegal voters, whom the judges knew were not qualified electors at the time the votes were cast. He says, of these fifty illegal votes a large number were imported from Wellington for the purpose of voting for Blue.

We can dismiss the charge of the illegal selection of the election board, by stating that of itself there was nothing unusual in its organization. King, the trustee of the township, who should have been there, was a candidate for reëlection, and desired to remain outside among the voters; and there

was nothing in the manner of their election to show that there was any preconceived plan of selecting those who served as judges. The other objections against them are supported by evidence demanding more consideration, and possibly by the action of the judges themselves there may have been some reason for believing they were selected for the purpose of giving Blue a large vote at that precinct; but we repeat, the manner of choosing them of itself would not indicate any corrupt practices.

This is error from the district court, but the case was argued, and it was expected and we believe it is necessary that we should review the rulings and judgment of the contest court. The amount of testimony introduced in this case is very great, and the record voluminous; perhaps all of the objections urged may not be noticed specifically in this opinion, but we have considered them all, and shall notice those which we deem important. The plaintiff in error says first, there was illegal testimony admitted over his objection and exception; second, that the court erred in making the findings of fact from the evidence admitted in the contest court.

The important question considered by the contest court was, whether or not the judges of election of Harper township were guilty of malconduct, fraud and corruption. If their guilt was established, then the contest court was authorized, and it was its duty, to reject the entire return from that precinct. (*Tarbox v. Sughrue*, 36 Kas. 225.) It is contended that before this can be done it must be shown that Blue, a party to this action, must have known and aided the judges in such malconduct. This is not necessary. It is enough if it be established that they were guilty of malconduct, fraud or corruption, without any reference to the participation therein or knowledge of any candidate. The complaints pressed upon our consideration of the errors in the admission of evidence, because Blue was not proven to have been connected with the illegal and corrupt acts, are disposed of by this enunciation of the law.

The first witness, Jennings, testified that at the election there

were two tickets, the "north" and "south," or the Harper and Anthony tickets, and he was allowed to detail in what manner the candidates on the different tickets were nominated, and what the feeling was in the county between the north and south parts thereof. We find no objection to the introduction of this testimony. The returns themselves, and other evidence introduced, tend to establish that behind the candidacy of the parties to this action there was a contest between the rival cities of Harper and Anthony, quite generally understood by the electors of Harper county; and in the rivalry the citizens living in or near each of the cities took part. This may have been carried to such an extent as to have been the motive, possibly, for the alleged misconduct of the election board at Harper.

During the trial it appeared that there was a printed circular distributed in Harper, which was headed "Demand your fees," and advised each witness summoned to demand his fees, mileage and attendance, when he should be served with a subpena. This was offered in evidence, and received as proof to show that the citizens of Harper were hostile to Peter, and were attempting to obstruct the witnesses from attending court, and to embarrass the full investigation of the case. We think the circular should not have been admitted in evidence. We know of no rule of evidence under which it would be admissible; but we cannot perceive how it was materially prejudicial to the defendant. In this connection the court made an order exempting all witnesses from arrest in coming from or returning to their homes. We do not know why this order was made; there is nothing in the record that would justify it; but it was harmless, protected no one, and only showed, possibly, that the judges were a little over-jealous of their power and dignity. In the absence of proof in the record why they should have issued such an order, we can simply say, that although it was an error it did not and could not have changed the result of the trial.

Plaintiff in error complains of the admission of the testimony of J. G. Meenan, who was a superintendent of a gang of men

on the railroad west from Wellington, in Sumner county; he
testified that a few days before the election in 1887, a Mr.
Drewer, of Harper, came to him and told him he wanted thirty
men to go to Harper to vote on election day, and repeated
several other statements made by Drewer to himself; and
also that there were others besides Drewer from Harper who
treated with him concerning this matter; there were quite a
number of witnesses besides Meenan who testified to the efforts
to procure men who lived in Wellington to go over to Harper
and vote on election day.   This testimony, it is claimed, was
admissible upon the theory that there was a conspiracy between
those persons trying to obtain illegal votes and the judges of
election, to elect Blue, and that anything done by any conspir-
ator in furtherance of the common design would be competent
to establish the malconduct of the judges.   Of course the
statements of these parties alone would not establish a conspir-
acy, but it is urged by Peter that the reception of these votes
by the judges was a part of their general plan to elect Blue.
There is some testimony— not very strong, however — to prove
there was a prearranged plan between the judges of the elec-
tion and the parties who brought these men from Wellington
as to the time and manner of depositing their votes.   This
testimony would not be sufficient, if standing alone, to prove
that they were banded together for the purpose of swelling the
vote for Blue in Harper precinct by illegal means and methods.
When this testimony was introduced, perhaps there was not
sufficient ground for its introduction; however, in the matter
of introducing testimony of this character the trial court had
a very large discretion, and we believe, taking the testimony
that was subsequently admitted in the case, there was certainly
enough to sustain the findings of the court of malconduct on
the part of the judges; and considering it in every phase of
this election, possibly the testimony introduced of these illegal
votes was competent to establish the conspiracy between the
judges of election themselves and those who brought the illegal
voters over from Wellington on election day.   It would be
profitless to discuss the testimony offered by each one of those

who cast illegal votes, and those who testified to the bargain for their votes at Harper. In dismissing this phase of the case, we will notice the objection made by plaintiff in error in his brief, that those who came from Wellington did not know for whom they voted for register of deeds. It is in evidence that of 612 votes polled, there was one vote for Peter, four blanks, and 607 for Blue; we presume this would be sufficient evidence to support the findings of the court that these illegal votes were cast for him.

The testimony in this case which has controlling weight with us is the poll-books of the election in November, which show the total vote of that precinct to be 612; the poll-book at the special railroad election, July, 1887, in which 609 votes were cast; and the returns of the trustee of Harper township, containing a list of all males over twenty-one in the township in the spring of 1887, being 417. On comparison of these lists, it appears that there were 222 names on the poll-book of the November election that do not appear on the poll-books of the July election, and upon the poll-books of the July election there appear 219 names which are not upon the November poll-books; there were 261 names upon the November poll-book that do not appear upon the assessor's list of Harper township and city. It appears that during the year in that precinct more than 800 voters apparently voted, as shown by the poll-books. These lists are proof sufficient to sustain the finding that there had been malconduct, fraud and conspiracy in the election in November at Harper.

There is nothing in this opinion in conflict with the law enunciated in the case of *Tarbox v. Sughrue*, supra. In that action as in this one, one of the main questions in dispute was whether the election board was guilty of malconduct in conducting the election. On the trial of that action in this court, evidence was introduced of the number of votes cast at that precinct at former elections, the census-roll, and the failure to identify and account for a large number whose names appeared on the poll-books. At the election at Dodge City there was an animated contest between three candidates for the same

office, each one of whom received a large vote. Vigorous partisans were closely watching the progress of voting in the interest of their favorite candidates; repeated challenges were made and decided by the board. At Harper no challenges were made, and the poll was practically unanimous for Blue, with no friends of Peter at the polls. In the Dodge City case there was much evidence of a large immigration into that section of the state during that year (1885); that the relative increase in the vote at Dodge City was not greater than at several other voting-places in Ford county. It was shown that many heads of families had located upon the public lands within the limits of Dodge City precinct, and that the registration list of Dodge City after it was incorporated as a city was incomplete for various reasons, and that the census-rolls were equally so. There was a total absence of evidence in this case to show why there had been such a sudden and rapid increase in the votes of Harper precinct; no reason assigned or proof proffered to show why there had been so great a change in the population from the 1st of March, 1887, to the railroad election on the 9th day of July, and between that day and the November election. In the action of *Tarbox v. Sughrue*, the trial was had at Topeka, and months after the election. This trial was begun the following month, and continued for thirty days, in the county where the election was held, and where the witnesses could be easily obtained.

In addition there were subpenas issued for about ninety of those claimed by Peter to be fictitious voters, and the return of the officer shows they were not found in Harper township. A number of the old settlers in Harper township were placed upon the stand, and were unable to account for a very large number of the names supposed to be fictitious. If they had been actually persons resident of Harper township or city, it appears as though the whereabouts of nearly every man could have been ascertained. The failure to find the residence of so large a number of purported voters is more than suggestive, and to our minds a very strong proof of fraudulent voting.

There is also a finding that there were 47 votes cast in the

names of those who had formerly been residents of the city and township, but had moved away before election day. The testimony justifies that finding, and in it we have additional proof of malconduct of the judges of election. These two findings and the evidence that supports them, with the other testimony offered, are sufficient to uphold the finding that the illegal votes cast by those who came from Wellington for that purpose were cast with the knowledge and connivance of the judges of election.

Another method of proving that the names on the poll-books were fictitious, and were not on the different lists, and that others were not residents of the township, was by asking those who had the best opportunity of knowing the residents of the township, if they knew or had heard of any one of the names appearing upon the poll-books. We believe it was competent and proper testimony as tending to show that the parties did not live in the township.

In regard to those who had left the township shortly before the election, the plaintiff was allowed to prove that it was generally rumored that the people named had moved away from Harper. This was incompetent testimony; it could not be justified under any rule of law; it was hearsay, could be easily manufactured, and was clearly inadmissible; the court erred in admitting it. In this connection also, in admitting the statements of these various parties in Harper after the election, concerning their connection with bringing these illegal voters from Wellington and coming over themselves, there was clearly error. The admission of a conspirator is no evidence against his fellow when the illegal act they had conspired to do has been accomplished, and this testimony should have been rejected. (*Gilleland v. Schuyler,* 9 Kas. 569; *The State v. Johnson,* ante, p. 266.) From the evidence introduced it is clear to our minds that the contest court had ample evidence for believing there was a conspiracy entered into by the judges of the election, at least, and probably with some persons outside their number, and for that reason it gave a wide latitude to the introduction of testimony. It is not to be wondered at

that a court, constituted as contest courts are, broke over some of the well-established rules of law in admitting evidence; but considering all the errors it committed, we come to the conclusion that its judgment in rejecting the poll of Harper township was correct. If there had been no other testimony than the poll-books of November and July, and the list of the assessor, and the return of the subpenas issued to those who were claimed to be illegal voters, and the proof by those who should be best acquainted in Harper that they knew of no such persons in the township, this evidence is enough to sustain the findings of the trial court.

When we come to this conclusion we must believe that Peter received more votes than Blue for the office of register of deeds, and therefore think he was elected to that office. We hold it to be of the utmost importance that not only every man should have the right to cast his ballot as he sees fit, but it is also of equal importance that it be counted as he cast it, and no illegal votes should be counted in the election in which he casts his ballot. It is the will of the majority that should control; and every fraud that is practiced to thwart it, every subterfuge and device that is used to defeat it, should be unhesitatingly condemned.

We recommend that the judgment of the district court be affirmed.

By the Court: It is so ordered.

All the Justices concurring.