LLOYD, APPELLANT, v. SULLIVAN, RESPONDENT.

ELECTIONS — *Supreme Court — Jurisdiction on appeal in election contest — Construction of statutes.* — Section 1044, fifth division of the Compiled Statutes, provides that election contests of county officers shall be tried by the District Court, and the person decided by said court to be elected shall be entitled to hold the contested office "until such decision shall be reversed on appeal." Section 418 of the Code of Civil Procedure provides that "a judgment or order in a civil action, except when expressly made final by this act, may be reviewed as prescribed by this act." Section 444 of the Code of Civil Procedure provides for an appeal to the Supreme Court from the District Court "from a final judgment . . . . entered in an action or special proceeding," and "from an order granting or refusing a new trial." The Constitution, article viii., section 3, declares that "the appellate jurisdiction of the Supreme Court shall extend to all cases at law and in equity." Section 11 defines the jurisdiction of the District Court to extend to all cases in law and in equity, including certain enumerated cases, "and for all such special actions and proceedings as are not otherwise provided for." Section 15 allows writs of error and appeals "from the decisions of said District Courts under such regulations as may be prescribed by law. *Held,* that these provisions when construed together extended the appellate jurisdiction of the Supreme Court to all cases, actions, and proceedings which have been finally decided in the District Courts, and included an appeal from an order refusing a motion for a new trial in an election contest.

SAME — *Pleading — Issue — Validity of returns.* — In the case at bar, the statement of contest alleged that the county clerk, disregarding his duty, issued a certificate of election to the respondent, claiming in support of such illegal action to have knowledge of the return of a large number of votes for respondent from a particular precinct, which said return had not been included in the abstract of votes, and which said votes had they been so returned would have given respondent the highest number of votes for the office; that there were no legal returns from said precinct. These allegations were denied by the respondent in his answer. *Held,* that the issues raised by the pleadings involved the question of the validity of the returns from said precinct.

SAME—*Fraud—Evidence.*—In the case at bar an election at a particular precinct was conducted by three judges instead of five, as required by law. The clerks selected to serve performed no clerical duties, but signed the returns the second or third day after the election. The canvass of the votes was conducted privately, and not in public as required by law, several persons being ejected, and others who sought admittance found the doors locked. The certificate of the returns was irregular, being certified by the judges and attested by the clerks, instead of being certified by the clerks and attested by the judges. The poll-book showed that after the judges and clerks had voted, the entire remainder of 169 electors cast their ballots in alphabetical order, and that every elector voted for a candidate for every office, and for or against the constitution. It appeared in evidence that all the electors did not vote for or against the constitution; that one elector did not vote, though his name was on the poll-book as having voted; that some electors did not vote for certain candidates, and some votes were returned for candidates other than for whom they were cast; that ballots were stamped by the judges after the polls were closed; that the voters did not go to the polls in alphabetical order. *Held,* that the returns of such precinct were fraudulent, and did not truly state the vote which each candidate for office received at the election.

SAME—*Evidence—Subpœnas.*—Subpœnas, with their returns duly verified, showing the names of voters at a particular precinct who could not be found, are admissible in evidence in an election contest to establish diligence on the part of the contestant in seeking to procure the best evidence. (Case of *Heyfron* v. *Mahoney, ante,* p. 497, affirmed.)

SAME—*Fraud—Burden of proof as to legal votes.*—In an election contest where fraud at a particular precinct is shown, both by direct and circumstantial evidence, the entire vote of such precinct must be rejected. The legal votes cast are not invalidated by the fraud, but the person claiming the benefit of such votes must prove them.

*Appeal from Second Judicial District, Silver Bow County.*

The contest was tried before McHATTON, J., without a jury.

*Thompson Campbell,* for Appellant.

Contestant brings this action under section 1043, fifth division of the Compiled Statutes, to determine which of the two candidates for the office of sheriff is entitled to the same, "in such manner as shall carry into effect the expressed will of a majority of the legal voters." Issue was joined as to the number of legal voters who voted at precinct 34, of the county of Silver Bow, and upon other issues raised by the pleadings. The contestant offered certain subpœnas and the returns thereon to show due diligence to procure the evidence of the persons illegally voting at said precinct, which offer was refused by the court. Upon this refusal of the court, contestant's proof of illegal votes and for whom cast was made by other evidence. (McCrary on Elections [3d ed.], § 460, et seq., and cases cited.) The contestant

assumed the difficult task of proving a negative, i. e., the want of qualification of a large number of voters, and the doctrine is well established that slight proofs make a *prima facie* case when a negative is to be proved. In all such cases rebuttal is comparatively easy, and is consequently of imperative obligation. (*Russell* v. *McDowell*, 83 Cal. 70.) Respondent offered no proof in rebuttal, and the evidence of contestant stands absolutely uncontradicted.

The returns of precinct 34 should not have been admitted in evidence for the reasons: (1) That they were not made out by the proper officers — the clerks of election. (2) The clerks of election did not participate in the canvass of the votes, and were not present at any time during the canvass of the votes. (3) The clerks of election did not certify to the correctness of the returns. (4) Two of the judges of election only canvassed the returns. (5) The polling place where the so-called canvass was being conducted by two of the judges was not in public; the door was kept locked and the windows covered so that the public could not and did not witness the canvass. (6) The returns are not certified as by statute required. (7) The clerks of election signed their names to the returns, as attesting, two days after the alleged canvass of the votes. (8) The clerks should have certified and not attested. (9) Three judges certified the returns, only two being present at the canvass. (10) The third judge, one O'Regan, not being present at any time during the canvass, but certified to them notwithstanding. (11) One of the judges, Pennycook, made out the alleged returns. (12) Pennycook and Morrison, two of the judges, conducted the canvass of the vote alone and secretly.

The evidence shows great frauds to have been practiced by the judges of election at precinct 34. (1) Morrison, one of the judges, endeavored to induce a person (Omo) not a voter of said precinct to vote in the name of an absent registered voter of said precinct. (2) Ballots were marked by one of the judges for identification when handed by a voter to be placed in the ballot-box. (3) A large number of ballots were destroyed, and others stamped with the "official stamp," and marked for the Democratic candidates. (4) The return shows 172 votes for the constitution and 2 votes against — the whole number of votes

cast at that precinct being 174. (5) The evidence shows 5 voters who did not mark their ballots for or against the constitution, unimpeached and uncontradicted. (6) The return shows 171 votes for the Democratic candidates, and but 3 votes for a majority of the Republican candidates. The evidence shows 5 voters voted for the Republican candidates at said election at said precinct. (7) The evidence shows a clear disregard of the mandatory requirements of the election laws with actual fraud as makes the true result doubtful.

The poll-book in evidence shows the voters at precinct 34 to have voted in alphabetical order. If the law was strictly complied with, if they so voted, and the presumption is that they did so vote, then they must have been under control and duress. If not, then the election law was disregarded by the officers of election, and the poll-book or list of voters voting was made up after the close of the polls, and copied from the check list by one of the judges, contrary to law. This is ground of throwing out the entire vote of the precinct, where there is no means of purging the poll. (*Russell* v. *McDowell, supra.*) Officers of elections are, like all other persons, presumed to know the law, and their deliberate omission to follow directions designed to prevent fraudulent voting, coupled with actual fraud, is ground of throwing out the entire vote of said precinct 34. The evidence is clear and uncontradicted of the fraudulent acts of the officers of election, and if no more, casts suspicion upon their integrity, and is sufficient, *prima facie,* to make out a case of fraud, and to so taint the returns that they are not to be received as proof of any fact sought to be proven by them. (*Russell* v. *McDowell, supra.*) The *prima facie* case made out by the contestant, as to the misconduct of, and frauds committed by the judges of said election, in the absence of any rebutting proof on the part of respondent, makes out a strong case on the part of contestant of malconduct and fraud by the said election officers, and directly impeaches the return of said precinct, rendering it valueless as evidence for any purpose. The court ignored the uncontradicted evidence of the witnesses produced by contestant, and has expunged and stricken out material evidence of said witnesses on the trial, disregarding the plain rules of elementary law.

This court should render final judgment in this cause. Any other rule in this class of cases would render them interminable, whereas these actions are intended to be summary, and to be brought to a final conclusion as soon as possible. To that end the whole case should be brought here on appeal, so that it may be finally settled without further litigation. Not only the interests of the parties, but those of the people who are also concerned in this class of cases, demand this practice. (*People* v. *Nichols*, 34 Cal. 217.)

*John W. Cotter*, and *M. Kirkpatrick*, for Respondent.

The appeal is not from the judgment but from an order overruling the contestant's motion for a new trial. A motion for a new trial does not lie in election cases, and therefore the court did not err in denying such motion. (*Dorsey* v. *Barry*, 24 Cal. 449; *Casgrave* v. *Howland*, 24 Cal. 457; Hayne on New Trial and Appeal, § 5.) This court has no jurisdiction of the appeal in this case. The appellate jurisdiction of this court is defined by the constitution of Montana as follows: "The appellate jurisdiction of the Supreme Court shall extend to all cases at law and in equity, subject, however, to such regulations and limitations as may be prescribed by law." (Art. viii. § 3.) An election contest is not a "case at law," nor a "case in equity," within the meaning of the constitution. It is in its nature a special statutory proceeding, wholly unknown to the framework of the common law. (*Saunders* v. *Haynes*, 13 Cal. 152; *Dorsey* v. *Barry*, *supra;* *Casgrave* v. *Howland*, *supra;* *Norwood* v. *Kenfield*, 34 Cal. 332; *Houghton's Appeal*, 42 Cal. 56; *Bixler's Appeal*, 59 Cal. 554; *Keller* v. *Chapman*, 34 Cal. 635; *Moore* v. *Mayfield*, 47 Ill. 167; *Ex parte Wimberly*, 57 Miss. 437, 447, 450; *Wright* v. *Fawcett*, 42 Tex. 206; *Gibson* v. *Templeton*, 62 Tex. 555; *Duson* v. *Thompson*, 32 La. An. 861; *Colin* v. *Knoblock*, 25 La. An. 264; *State* v. *Dubuclet*, 28 La. An. 703; *French* v. *Lighty*, 9 Ind. 475; *State* v. *Commissioners*, 31 Ohio St. 455, 456; *Ellingham* v. *Mount*, 43 N. J. L. 472; *Handy* v. *Hopkins*, 59 Md. 157.) The constitution in defining the jurisdiction of the District Courts distinguishes "special actions and proceedings" as separate and distinct from "cases at law

and in equity." (Art. viii. § 11.) The legislature cannot confer upon the Supreme Court, nor on any other constitutional court, a jurisdiction not granted to it by the constitution. (*Parsons* v. *Tuolumne Water Co.* 5 Cal. 43; *Caulfield* v. *Hudson*, 3 Cal. 389; *Ex parte Attorney-General*, 1 Cal. 85; *People* v. *Kern County*, 45 Cal. 679; *Camron* v. *Kenfield*, 57 Cal. 550; *Farmers' Union* v. *Thresher*, 62 Cal. 407; *Hobart* v. *Tillson*, 66 Cal. 210.) As regards the jurisdiction on appeal in special cases of the Supreme Court of California, under the constitution of that State, there has been much doubt and fluctuation of opinion on the part of the court; and such appeals, when sustained, have been sustained, not upon the language of the constitution, but on the ground of a long and unquestioned practice to that effect, the court appealing to the maxim, *contemporanea expositio est fortissima in lege.* And as yet the rule can hardly be said to be settled there in favor of the jurisdiction. (Hayne on New Trial and Appeal, § 179.) But here the maxim does not apply. Under the constitution of Montana there has been in this regard no practice whatever. This is the first case, and the jurisdiction being challenged *in limine*, the court is at liberty, untrammeled by previous decisions, to give to the language of the constitution its proper construction. If it be said that the convention took the provisions in question from California (as to which we know nothing) and adopted her construction along with it, the reply is that such construction is not binding on the court, and even were it a settled one, it cannot reasonably be said that this court must adopt a construction which her own courts tacitly admit is not authorized by the language of her constitution. That the territorial Supreme Court had such jurisdiction is true, for the jurisdiction of that court was as fixed by the territorial statute; but although those statutes are now statutes of the State, they cannot confer jurisdiction on this court, whose jurisdiction is fixed by the constitution and not by the statute.

The *prima facie* right of the respondent to the office is admitted by the pleadings, and also established by the evidence of contestant. It is alleged in the complaint that independently of precinct 34, contestant received 3,490 and respondent 3,363 votes; that at precinct 34, 165 votes were cast for respondent and 9 for contestant. These facts are also alleged in the answer

and not denied in the replication. They were also proven affirmatively by contestant, who introduced the abstract made by the county board of canvassers, and also the returns from precinct 34, for the specific purpose, as announced at the time, of proving how many votes were polled thereat for Sullivan and how many for Lloyd. This shows a majority of 29 for Sullivan on the whole vote cast in the county for the office of sheriff. The pleadings also admit that the returns from precinct 34 are valid on their face. True, the complaint alleges there were no legal returns from that precinct — a conclusion of law. The answer, on the other hand, sets out the facts which constituted those returns, none of which are denied by the replication. The facts so admitted are embodied in finding 5 of the court, and establish that the returns are regular in form, and show the vote cast and for whom cast — the true result of the poll. Says Mr. McCrary: "The rule is that the return must stand until impeached, i. e., until shown to be worthless as evidence — so worthless that the truth cannot be deduced from it." (McCrary on Elections, § 480.) The contestant also admitted the truthfulness in this respect of the returns from precinct 34 by introducing them in evidence, to show the vote polled for the office of sheriff thereat. That this was a sufficient *prima facie* case for respondent. (See *Brown* v. *Jeffries*, 42 Kan. 605.) Respondent's *prima facie* case was also made out by the certificate of election issued to him by the proper officer, under the circumstances set out in the answer and in finding 6. (McCrary on Elections, §§ 283, 286.)

It being admitted by the pleadings, and also established by the evidence introduced by contestant himself, that 165 votes were polled for Sullivan and 9 for Lloyd at precinct 34, and there being no allegation of fraud, intimidation, or undue influence in regard to this vote, and no evidence whatever impeaching its fairness, it not appearing that any person who voted for Lloyd was counted for Sullivan, nor that any person who intended to vote for Lloyd was, by unfair or fraudulent means, induced to vote for Sullivan, and both parties in fact agreeing upon the same result, it follows that the question of fraud in the conduct of the election at precinct 34, which was thrust into this case by contestant against the objection of respondent, is an imma-

terial matter, and cannot be considered as an element in its determination. Even if fraud were shown at precinct 34, and the returns for that reason were rejected, it could not affect the result in this case; for the inquiry here goes behind the returns and seeks to ascertain the actual vote polled at that precinct for the office of sheriff, and since that fact is known and admitted by all parties, to wit, that 165 votes were polled for Sullivan and 9 for Lloyd, and since there is no charge of fraud or unfairness with regard to this vote for sheriff, it must stand although the returns might fall. Says Mr. McCrary: "If satisfactory proof of the actual vote can be made, and the result thus ascertained, the election may stand although the return falls to the ground." (McCrary on Elections, § 542.)

BLAKE, C. J.—This is an election contest between Lloyd, the appellant, and Sullivan, the respondent, who were candidates for the office of sheriff of the county of Silver Bow at the election held in 1889. The certificates of the nomination of Lloyd by the Republican, and Sullivan by the Democratic conventions were properly filled. The official abstract of the vote cast at the election, according to the canvass which was made October 14, 1889, gave Lloyd, 3,490, and Sullivan, 3,363 votes. There was no other canvass of the vote for these parties, but the county clerk issued the certificate of election to Sullivan.

The statute which governs the procedure and trial of the issues arising in this proceeding provides as follows: "All contests of county . . . . officers shall be tried in the proper county, and when an elector shall wish to contest such election he shall file with the clerk of the board of county commissioners, within ten days after such person shall have been declared elected, a statement in writing, specifying the grounds of contest, verified by affidavit, and such clerk shall issue to the contestant a notice to appear at time and place specified in the notice, before the District Court . . . ." (Comp. Stats. fifth div. § 1043.) Then follows this section: "Sec. 1044. The district judge, at the time specified in the notice (and it shall appear by the sheriff's return that notice has been duly served on the contestor), shall proceed to try such contest. Each party shall be entitled to subpœnas, and subpœnas *duces tecum,* as in ordinary cases in law,

and the District Court shall hear and determine in such manner as shall carry into effect the expressed will of a majority of the legal voters, as indicated by their votes for such office, not regarding technicalities or error in spelling the name of any candidate for such office; and the clerk of said court shall issue a certificate to the person declared to be elected by said court, which shall be presumptive evidence of the right of said person to hold such office, and he shall be entitled to enter upon and hold said office until such decision shall be reversed on appeal." In pursuance of these statutory requirements, the proper notices were filed, issued, and served by Lloyd, an answer was made by Sullivan to the statement of contest, and a replication was filed by Lloyd. It will be necessary to observe carefully some of the proceedings upon the trial, and to prevent any misunderstanding thereon they will be recited in the language of the court below. The following judgment was entered February 24, 1890: "This cause came on regularly for trial on the eleventh day of February, 1890, before the court, sitting without a jury. . . . . Whereupon witnesses were examined and other evidence introduced on the part of the contestant and respondent respectively, and the evidence being closed, and the argument of counsel heard, the cause was submitted to the court for consideration and decision; and after due deliberation thereon, the court delivers its findings and decision in writing, which is filed, and orders that judgment be rendered in accordance therewith. Wherefore by reason of the law and the findings aforesaid, it is by the court ordered, declared, and adjudged that, at the general election held in the county of Silver Bow on the first Tuesday, being the first day of October, 1889, the respondent, Eugene D. Sullivan, received a majority of all the legal votes cast in said county at said election for the office of sheriff of said county of Silver Bow, and was and is duly elected to said office. . . . ."

The findings of the facts, which are fifteen in number, contain this statement: "The evidence in the above-entitled cause having been fully heard, together with the argument of counsel for the respective parties, and the same having been submitted to the court for decision, the court, in response to the written request of the parties, makes the following findings of fact from the evidence, and its conclusions of law thereon."

Thereupon Lloyd filed a notice of his intention "to move the court to vacate and set aside the decision of the court rendered in the above cause, and to grant a new trial of said cause." The statement, which was "approved and allowed" March 31, 1890, by the judge of the court below, contains the testimony which was introduced upon the trial, the exceptions which were saved by the appellant, and the specifications of the "particulars in which the evidence is insufficient to sustain the findings and decision of the court." Upon April 3, 1890, "the motion for new trial herein, heretofore taken under advisement, is by the court overruled, and to which ruling of the court plaintiff, by counsel, duly excepts." The notice of appeal states "that the contestant in the above-entitled action hereby appeals to the Supreme Court of the State of Montana, from the order of the District Court of the Second Judicial District of the State of Montana, overruling contestant's motion for a new trial of said action, and refusing a new trial thereof, made and entered in said court on the third day of April, A. D. 1890."

At the threshold of this inquiry the respondent contends that the motion for a new trial does not lie, and that the court has no jurisdiction of the appeal.

The statutes and constitutions of the States vary materially, and it must be admitted that the decisions are not harmonious upon this question. The law of this State, which has been cited, evidently contemplates that the judgment of the District Court shall not be final, for its terms expressly limit the right of "the person declared to be elected" to "enter upon and hold said office until such decision shall be reversed on appeal." The construction sought to be enforced by the respondent renders this provision nugatory, and deprives the aggrieved party of a substantial right. In *Payne* v. *Davis*, 2 Mont. 382, the value of the property involved in the controversy was fifty dollars; the act of the legislative assembly declared that this court shall have jurisdiction in civil cases "where the amount in dispute exceeds one hundred dollars." Upon the motion of the respondent to dismiss the appeal, we held that "statutes must be so construed as to maintain the right of appeal, if the established rules of interpretation are not violated;" and adjudged that the restriction was inconsistent with the organic act of the Territory,

which allowed appeals "in all cases from the final decisions" of the District Court, and therefore void. The case was then heard and determined upon its merits. Subsequently the statute concerning this subject was amended, and now provides as follows: "The Supreme Court shall have appellate jurisdiction in all cases tried in the District Courts." (Code Civ. Proc. § 697.) Let us consider some sections of the Code of Civil Procedure. "A judgment or order in a civil action, except when expressly made final by this act, may be reviewed as prescribed by this act." (§ 418.) "An appeal may be taken to the Supreme Court from the District Courts in the following cases: *First.* From a final judgment, or any part thereof, entered in an action or special proceeding commenced in those courts, or brought into those courts from other courts. *Second.* From an order granting or refusing a new trial." (§ 444.)

The Constitution declares that the "appellate jurisdiction of the Supreme Court shall extend to all cases at law and in equity" (art. viii. § 3), and it is claimed by the respondent that an election contest is not included by the word "cases," which has a technical meaning. This construction would confine the jurisdiction of this court within narrow bounds. But it is obvious that full effect has not been given to every part of the instrument, which in this matter is its own interpreter. The eleventh section uses this language in defining the jurisdiction of the District Court: "The District Court shall have original jurisdiction in all cases at law and in equity." Then follows this phrase, "including all cases," which are enumerated, such as "proceedings in insolvency, . . . . actions to prevent or abate a nuisance, . . . . all matters of probate, . . . . actions of divorce, and for annulment of marriage, and for all such special actions and proceedings as are not otherwise provided for." The framers of the constitution have plainly ignored the familiar signification which is attached in the reports to "cases at law" and "cases in equity." This view is confirmed by this section: "There shall be but one form of civil action, and law and equity may be administered in the same action." (Art. viii. § 28.) The fifteenth section of the same article is of vital force in this discussion. "Writs of error and appeals shall be allowed from the decisions of the said District Courts to the Supreme Courts

under such regulations as may be prescribed by law." Construing these provisions together, it is clear that the appellate jurisdiction of this court extends to all cases, actions, and proceedings which have been finally decided in the District Courts. Our jurisdiction is in substance similar to that of the Supreme Court under the territorial government, and this objection could have been urged with equal power before the period of transition to statehood.

The case of *Heyfron* v. *Mahoney, ante,* p. 497, which was an election contest under the statute *supra* for the same office, was filed July 8, 1889, in the Supreme Court of the Territory, and was upon the docket during three terms. The able and learned counsel for the respondent never questioned the jurisdiction of the appellate court, and argued the cause upon its merits.

The cases of *Dorsey* v. *Barry,* 24 Cal. 449, and *Casgrave* v. *Howland,* 24 Cal. 457, support the position of the respondent, that the power of the court which tries an election contest ceases upon the entry of the judgment, and that it cannot grant a new trial, or re-open the issues of law or fact. This conclusion is reached by the construction of this section of the Code of Civil Procedure of the State of California: "Either party aggrieved by the judgment of the court may appeal therefrom to the Supreme Court, as in other cases of appeal thereto from the County Court." (§ 1126.) This is found in the title, which provides for "contesting certain elections." When we consult the chapter regulating "appeals from County Courts," it will be seen that they are limited to "an order granting or refusing a new trial in the cases designated in this section." (Code Civ. Proc. § 966.) Election contests are not specified in the "cases" which are enumerated. But in this State, the District Court possesses jurisdiction of the same matter, and the practice has been uniform that the appellate court will not consider the evidence in the record when there is no motion for a new trial. (*Allport* v. *Kelley,* 2 Mont. 343; *Chumasero* v. *Vial,* 3 Mont. 376; *Largey* v. *Sedman,* 3 Mont. 472; *Broadwater* v. *Richards,* 4 Mont. 78; *Twell* v. *Twell,* 6 Mont. 19; *Alder Gulch Con. Min. Co.* v. *Hayes,* 6 Mont. 31; *Blessing* v. *Sias,* 7 Mont. 103.) On an appeal from a judgment, the judgment roll alone is brought before this court. (*Chumasero* v.

*Vial, supra; Clark* v. *Baker,* 6 Mont. 153; *Princeton Min. Co.* v. *First Nat. Bank of Butte,* 7 Mont. 530.) In *Chumasero* v. *Vial, supra,* we said: "This appeal has been taken from the judgment alone, and the only questions before us relate to the conclusions of law which must be drawn from the facts." The case of *Princeton Min. Co.* v. *First Nat. Bank of Butte, supra,* was tried by the court without a jury, and Mr. Justice Bach in the opinion says: "There was no motion for a new trial made; therefore we are to conclude that all of the findings are supported by the evidence; that there was no evidence to sustain the findings requested and refused; and that where there is no finding on any issue, the court found in favor of the plaintiff upon that issue. Such is the rule laid down by the statutes, and from the authorities." This procedure was followed in *Heyfron* v. *Mahoney, supra,* and has been adopted in some States. (*Govan* v. *Jackson,* 32 Ark. 553; *Dobyns* v. *Weadon,* 50 Ind. 298; *Hadley* v. *Gutridge,* 58 Ind. 307.) We are therefore of the opinion that the appellant was compelled by the adjudications of this court to resort to the practice which is therein defined.

It now becomes necessary to refer to some of the findings of the facts by the court below which are properly before us for review.

5. "The returns of the election at precinct 34 were delivered to the clerk of the board of county commissioners by the said W. A. Pennycook, one of the judges, in person, some time between the first and fifteenth days of October, 1889. . . . . The said returns contained the proper tally sheets and extensions, the names of the candidates voted for, the number of votes received by each, written in full length, in words duly certified by the judges and clerks who held the said election at said precinct. . . . . The signatures to the said returns are in the true and genuine handwriting of the judges and clerks of election at said precinct, and from an inspection of said returns, the number of votes cast, and for whom cast, can be easily ascertained."

7. "The said returns from said precinct 34 show upon their face, and the court finds the fact to be, that 174 votes were polled thereat at said election, and that the respondent, Eugene D. Sullivan, received at said precinct, 165 votes, and the contest-

ant, John E. Lloyd, 9 votes. At all the other precincts of said
county, as shown by the returns thereof, respondent received at
said election 3,363 votes, and the contestant 3,490 votes; so that
counting the votes cast at precinct 34, together with the votes
cast at all the other precincts of said county for the office of
sheriff, the contestant, Lloyd, received 3,499 votes, and the
respondent 3,528 votes, a majority of 29 votes for said office,
in favor of said Sullivan, and the court so finds the fact to be."

11. "The polls were closed at six o'clock as announced, and
thereafter, during the evening and night of said day, the said
judges proceeded to canvass and count and make out the returns
of the votes cast at said precinct."

12. "That A. N. Anderson and Thomas O'Keefe, who were
sworn as clerks of election at said precinct 34, performed none
of the clerical work thereat, but all the clerical work was per-
formed by the judges, and principally by Pennycook."

15. "On the whole evidence, the court finds that the said
election held at precinct 34 in said county on the first day of
October, 1889, was fairly and honestly conducted; that no fraud
was committed or attempted at said precinct by the election offi-
cers or others; that such irregularities as occurred thereat were
without fraudulent intent and resulted in injury to no one, and
did not affect the result or the fairness of the election; that all
voters registered for said precinct who applied to vote were per-
mitted to vote; that no intimidation or undue influence was
exercised or attempted upon the voters by any one; that the said
judges and clerks, nor neither of them, did not mark any ballot
after its delivery by the voters to the judge of election, nor were
said ballots marked by the judges of election in any manner,
except by the official stamp placed thereon before they were
delivered to the voters; and that the said returns from the said
precinct 34 express and show the true and correct result of said
election held thereat."

It is apparent from the findings of the facts that the election
of the appellant or respondent to the office in controversy depends
upon the vote of the precinct numbered 34, in the county of Silver
Bow. The court below decided that the returns which had been
rejected by the board of canvassers were valid, and exhibited the
true count of the ballots which had been cast by the legal voters.

This is the battle field of the judicial conflict.  We are surprised that the counsel for the respondent maintains that "the question of fraud in the conduct of the election at precinct 34, which was thrust into this case by contestant against the objection of respondent, is an immaterial matter, and cannot be considered as an element in its determination."  This was the main issue at the trial upon which testimony was offered by both parties, and the objections of the respondent upon similar grounds were overruled, and the court found distinctly thereon and rendered judgment accordingly.

The record shows that Sullivan had commenced an action against Lloyd, and that, upon a question raised by counsel, the court said: "In these two cases there is only one point to decide, and that is as to who is entitled to this office.  It seems to me that it is unnecessary to try both of the cases.  The court is only desirous to determine the rights of these parties on the evidence that may be presented to it.  I think that from the pleadings presented in these two cases, the case of *Lloyd* v. *Sullivan* presents all the issues between these parties, and the issue of that will determine the whole matter."  The statement of contest says that the county clerk, "disregarding his plain duty, . . . . issued a certificate of election to the said office to the said Sullivan; that the said clerk, in support of his said illegal action as hereinbefore set out, claims to have knowledge of the return of a large number of votes for the said Sullivan as returned from precinct 34, said county, and which said returns were not included in the said abstract of votes, and which said votes, if they had been so returned, would, in fact, give to the said Sullivan the highest number of votes for the said office; that in fact and in law, there were no legal returns presented to said canvassers from the said precinct 34. . . . . That there were no legal returns, as by law in such cases provided, ever or at all received by said canvassers."  The answer denies these allegations.

The transcript shows that the appellant at all times assailed the returns of this precinct, and the conduct of the officers thereof, and pointed out specifically his objections.  The respondent did not file a demurrer to the statement of contest, or move to make any part thereof specific and certain, or by any pleading attack the same.  In *Heyfron* v. *Mahoney, supra,* we considered briefly

the nature of this proceeding, and held that it was proper to allow the grounds to be amended to conform to the proof. If the court below had sustained this objection of the respondent, the appellant could propose amendments in compliance with the ruling, and the same issue would have been heard and determined. But we think that the trial was conducted upon the correct theory and interpretation of the pleadings.

This view is entertained by distinguished lawyers, whose opinion upon the issue involved in the contest is entitled to great respect. Hon. George Gray, of Delaware, delivered a speech in April, 1890, in the Senate of the United States, regarding this matter, and said: "I had intended, but I will not detain the Senate longer by doing so, to refer to the opinion of the court of the State of Montana, after the Territory had become a State, in a cause that was properly before it concerning the election of the sheriff of Silver Bow County, in which the whole conduct of that election at precinct 34 was gone into judicially, and judicially found and determined. . . . . In the case to which I have just alluded, decided in February, the court makes certain findings. They are very interesting, of course not binding on the Senate, but certainly persuasive, as the judgment of a court upon the facts that were in contest before it in a case pleaded to issue, and in which the issue involved the integrity of these polls." (2 Cong. Record, p. 3104.) The fifteenth finding of fact, *supra,* is then quoted by the honorable senator, who has a bias for the respondent. We have read carefully every speech and document relating to the admission of the senators from this State, and cannot find any expression of dissent from this remark regarding the issue to be investigated by the court below. When we reflect that every observation in that high body of legislators attracts searching and intelligent criticism, the unanimity upon this point is convincing.

The branches of this extensive examination may be treated in four divisions, and we will discuss, in the first place, the conduct of the officers of the election at precinct 34, and the statutes governing them.

It appears that there were three persons who served as judges of election, W. A. Pennycook, John Morrison, and William O'Reagan, the first two named being appointed as Republicans,

and the last a Democrat. The statute requires the number to be five, and that vacancies shall be filled on the morning of the election by the voters. (Stats. 16th Sess. p. 140, § 21; Comp. Stats. fifth div. § 1011.)

"The said judges shall choose two persons, having the same qualifications with themselves, to act as clerks of the election." (Comp. Stats. fifth div. § 1012.) A. M. Anderson and Thomas O'Keefe were evidently selected for this purpose. Anderson, the sole officer of the election who testified at the trial, was called by the respondent, and we quote from the record his answers to questions. "Pennycook wanted me to act as clerk, and I refused, but he said to stay around and he would do it for me.

"There was another clerk appointed, too? Yes, sir. Tom O'Keefe.

"Did he act as clerk? I don't think he did.

"Who did the clerical work? Pennycook.

"Did Morrison do some? Yes, sir.

"So that the clerks did not do the work, that work was done by the judges? Yes, sir. I went away about eight minutes to seven.

"The polls were closed then? Yes, sir. They closed the polls at six o'clock.

"Did Pennycook say anthing about going away? No, sir. I asked him at six o'clock if I could go, and he said, yes, you can go to work."

The witness testified that he worked the night before and the night after the election, and upon cross-examination said:—

"You say that you came down according to Mr. Pennycook's orders, to act as clerk of that election? Yes, sir, he sent for me.

"As a matter of fact, did you ever write a line in that election? I never did.

"Who showed you the election returns after the close of the election? Pennycook.

"Where? He showed it to me when he came back from town.

"When he came back from Butte? The next time I saw him.

"Where did he have them? He had the papers in his hands.

"Did you certify that they (the returns) were correct? Yes, sir.

"How did you know that they were correct, if you did not keep them yourself? I don't say that I just know.

"Is it not a fact that you do not know whether they were correct or not? How could I know, when I did not keep then.

"Do you know when Keefe signed those returns? I suppose the same time as I did, the same day.

"Was his name down when you signed? No, he signed after me, I think.

"When did you see Pennycook after that (the closing of the polls and going to work)? I don't know if it was a day or two days.

"You didn't see him the next morning? No, sir. I went right to bed when I came from my work.

"You didn't see him the second day after that? I think I saw him that night at twelve o'clock, when I was eating my supper. I saw him then.

"What night was that? The second or third night after election."

What are the duties which the law devolves upon the clerks of an election? "Previous to votes being taken, the . . . . clerks of election shall take and subscribe the following oath: I, A B, do solemnly swear or affirm that I will perform the duties of clerk of the election, according to law and the best of my ability, and that I will studiously endeavor to prevent fraud, deceit, and abuse in conducting the same." (Comp. Stats. fifth div. § 1015.) At the opening and before the closing of the polls, "one of the clerks, under the direction of the judges, shall make proclamation of the same." (Comp. Stats. fifth div. § 1017.)

"The clerks of the election shall enter the name of the elector and number in the poll-book." (Comp. Stats. fifth div. § 1017.)

"Upon the adjournment of the polls the clerk shall, in the presence of the judges, compare their respective poll lists, compute and set down the number of votes, and correct all mistakes that may be discovered, according to the decision of the board,

until such poll lists shall be made in all respects to correspond."
(Comp. Stats. fifth div. § 1024.) "The ballots and the poll
lists agreeing, or being made to agree, the board shall then pro-
ceed to count and ascertain the number of votes cast, and the
clerks shall set down in their poll-books the names of every
person voted for, and, at full length, the office for which such
person received such votes, and the number he did receive, the
number being expressed at full length, such entry to be made,
as near as circumstances will admit, in the following form: . . . .
Certified by us.            Attest:

     B    ⎫                M N ⎫
  and ⎬ Clerks of election.       O P ⎬ Judges of election."
   C D ⎭                 Q R ⎭

(Comp. Stats. fifth div. § 1030.)

"The judges of election shall then enclose and seal one of
the poll-books, under cover, directed to the clerk of the board
of county commissioners of the county in which such election
was held, and the packet thus sealed shall within three days
from the closing of the polls be conveyed by one of the judges
or clerks of election, to be determined by lot, to the postoffice
nearest the house in which said election for such precinct was
held, and register and mail the same to the clerk of the board
of county commissioners." (Comp. Stats. fifth div. § 1031.)

All the statutory provisions requiring the services of the
clerks of the election at precinct 34 were deliberately violated
by the three judges. The clerks were selected with the under-
standing that they did not possess the necessary qualifications,
and that they should not perform their lawful duties. The
poll-book, which is mentioned in the last section, was delivered
personally by Pennycook to the county clerk. There is no evi-
dence to prove the time when the poll-books and returns were
prepared, but Anderson did not affix his signature until the
unusual hour of midnight upon the second or third day after
the election, and the name of his co-clerk, Keefe, was not visi-
ble. In the mean time Pennycook had visited Butte and
returned, and it is needless to say that it was generally known
then from the news of the election which had been received that
the vote of precinct 34 might turn the scale in the county of
Silver Bow and the State. He was compelled to make another

trip to Butte and carried the poll-book, which for some inexplicable reason had not been put in proper form as promptly as the law demands.

"As soon as the polls of the election shall be finally closed, the judges shall immediately proceed to canvass the vote given at such election, and the canvass shall be public, and shall continue until completed." (Comp. Stats. fifth div. § 1027.)

John Wilson testified that he and Charles Omo were in this polling place about 7:30 o'clock, P. M.

"Did somebody put him (Omo) out? He was told to go out.

"By whom? By Pennycook.

"What else did he say to him? I don't know as I heard him say anything, except that he had no business there, he said.

"What did Omo say? He stepped out."

Charles Omo testified :—

"What else did you see him (Pennycook) do while you were there? He stopped very shortly when I stepped in, and says, 'What can I do for you?' I said isn't there anything in here to drink or smoke? 'No,' he says, 'there is nobody allowed in here, and the polls are closed; please step out.' I said I supposed this was a public place. He said, 'Not at present; please step out.' I did not move, and he jumped up and came over to where I was and said, 'Please step out.'

"What did you do when they told you to go out? Looked around and then stepped over to the door, and Pennycook took me by the shoulder, and said, 'Please step out,' and I said, 'All right,' and walked out, and he shut the door behind us.

"Who told you that this was not a public place? Pennycook.

"Did these gentlemen say anything to you about it? Morrison said the best thing you can do is to go out and attend to your business."

Thomas McCann testified that he voted "the straight Democratic ticket, except two men."

"Were you there after the polls closed? I was.

"Did you go into the polls after they were closed? No, sir.

"Why did you not? I could not get in.

"Did you try to get in? Yes, sir.

"Why couldn't you get in? The judges wouldn't let me.

"Did you notice anything peculiar about this place? Nothing, only the door was locked.

"Did you try it? Yes, sir.

"Do you know who was inside? Pennycook and Morrison; that was all I saw.

"How did you see him? I saw Pennycook open the door once or twice.

"What did you say to the persons inside when you tried to get in and found the door locked? I told them that I thought anybody could go in there that wanted to.

"What did they reply? That they could not.

"You were there until half past nine? Yes, sir, about that time; I went to bed between half past nine and ten.

"Were they (Pennycook and Morrison) in there all that time? Yes, sir."

Dennis O'Neil testified that he was "electioneering" at this precinct, and "voted for the Democratic candidates."

"You say that you went up to the polling place after the polls were closed, and that the only reason that no person was allowed in there was what Pennycook told you that they were drunk? Yes, sir.

"Do you know that the other men who went there and asked for drink were drunk? No, sir.

"You don't? I know that they was not.

"You know that men went there and asked for admission who were not drunk? Yes, sir."

From this and other evidence which is contained in a voluminous record, and cannot be quoted at length, it is proved that O'Reagan, one of the judges of the election, did not discharge his grave public task after the polls were closed. Pennycook and Morrison conducted privately the canvass, and excluded all persons from a privilege secured by the statute. The testimony does not prove that one citizen ever saw a ballot produced from the box of this precinct, or heard it read or tallied. There was no public canvass. The record does not disclose any reason for the assumption by Pennycook and Morrison of the labor and responsibility, which should have been shared by five judges and two clerks of the election.

The certificate of the returns is irregular.

"Certified by us, this second day of October, A. D. 1889.

Attest:

Thomas O'Keefe, } Clerks of    W. A. Pennycook, } Judges of
A. N. Anderson, } election.     John Morrison,   } election."
                                William O'Reagan, }

The statute *supra* requires the clerks to certify and the judges to attest the number of votes received by each person.

*Second*— We will now comment upon the anomalous features of the returns of precinct 34. The statute provides that the name of every elector shall be pronounced "with an audible voice" by the judges to whom his ticket may be delivered before the same shall be put in the box, and "the clerk of the election shall enter the name of the elector and number in the poll-book." The voters of the precinct were numbered consecutively from 1 to 174, and the poll-book shows that they cast their ballots in the following remarkable order: The three judges, the two clerks, and the remainder in alphabetical array, according to the capital letter, from John A. Anderson to Robert Youngberg. This is the list:—

| No. | | No. | |
|---|---|---|---|
| 1. | W. A. Pennycook, | 19. | Wm. Broes, |
| 2. | John Morrison, | 20. | John Boucher, |
| 3. | Wm. O'Reagan, | 21. | Noble Britton, |
| 4. | Thos. O'Keefe, | 22. | A. Brooks, |
| 5. | A. N. Anderson, | 23. | J. J. Brandt, |
| 6. | John A. Anderson, | 24. | Wm. Bruns, |
| 7. | S. Alsworth, | 25. | R. Brystrom, |
| 8. | Hen. Anderson, | 26. | B. A. Borjesson, |
| 9. | Axel Anderson, | 27. | Frank Curry, |
| 10. | H. Abraham, | 28. | N. Cannavan, |
| 11. | N. E. Album, | 29. | F. H. Cirdland, |
| 12. | Swan Anderson, | 30. | N. Cowley, |
| 13. | James Bush, | 31. | C. Campbell, |
| 14. | C. Baandet, | 32. | J. Clark, |
| 15. | Wm. Beattie, | 33. | Tom Cavanaugh, |
| 16. | John Berggsen, | 34. | Chris Carolin, |
| 17. | Frank Brady, | 35. | P. Cuisere, |
| 18. | H. Broderick, | 36. | J. Cosgrave, |

| No. | | No. | |
|---|---|---|---|
| 37. | C. Cassidy, | 76. | C. Johnasson, |
| 38. | D. Doccico, | 77. | A. Jensen, |
| 39. | G. Doccico, | 78. | J. F. Johnson, |
| 40. | N. Doherty, | 79. | A. Johnson, |
| 41. | John Durkin, | 80. | Ole Johnson, |
| 42. | C. A. Dahlgreen, | 81. | Sam Johnson, |
| 43. | John Delavan, | 82. | Chas. Johnson, |
| 44. | Joe Davis, | 83. | Frank Johnson, |
| 45. | Jas. Douglas, | 84. | R. Keopke, |
| 46. | Martin Deecy, | 85. | N. Knutson, |
| 47. | Thos. Dunn, | 86. | J. N. Kelly, |
| 48. | M. Dougherty, | 87. | S. Kehren, |
| 49. | R. Eagleson, | 88. | John Kaskela, |
| 50. | Jas. English, | 89. | Nels Kukkola, |
| 51. | O. N. Erickson, | 90. | M. Kearney, |
| 52. | L. N. Fish, | 91. | M. F. Keefe, |
| 53. | Mike Flaherty, | 92. | Robt. Kelly, |
| 54. | Chas. Fenton, | 93. | Ed Leary, |
| 55. | T. F. Gibbons, | 94. | Fred Levett, |
| 56. | Jas. P. Gallagher, | 95. | Ed Lang, |
| 57. | Tom Gallagher, | 96. | D. J. Lynch, |
| 58. | Wm. Grant, | 97. | A. Linden, |
| 59. | A. Gillis, | 98. | N. Linden, |
| 60. | E. Grenlund, | 99. | A. Locke, |
| 61. | Wm. Goodwin, | 100. | Jere Larkin, |
| 62. | John Gustafson, | 101. | Jan Linfras, |
| 63. | O. Gilhooly, | 102. | C. Lindgren, |
| 64. | A. Green, | 103. | E. Larson, |
| 65. | Thos. Herson, | 104. | C. Lindergreen, |
| 66. | Mat Hoynes, | 105. | C. Larsen, |
| 67. | Pat Hannigan, | 106. | Otto Leyer, |
| 68. | A. Henderson, | 107. | Wm. Maher, |
| 69. | D. Hogan, | 108. | Jas. Mulligan, |
| 70. | Chas. Holstrom, | 109. | John Moriarity, |
| 71. | T. Hendrickson, | 110. | J. Moran, |
| 72. | M. F. Hogan, | 111. | P. W. Murphy, |
| 73. | Wm. Huldberg, | 112. | J. P. Murphy, |
| 74. | Ole Hanson, | 113. | N. Morfin, |
| 75. | Matt Isaacson, | 114. | R. Mooney, |

| No. | | No. | |
|---|---|---|---|
| 115. | J. Murey, | 145. | Jos. Preston, |
| 116. | L. K. Moore, | 146. | J. F. Pogson, |
| 117. | J. P. McDonald | 147. | C. F. Peterson, |
| 118. | John McLeod, | 148. | John Petterson, |
| 119. | B. McHugh, | 149. | A. Rod, |
| 120. | John McAvoy, | 150. | John Reynolds, |
| 121. | J. McFadden, | 151. | A. Richter, |
| 122. | D. McCarthy, | 152. | Jas. Ryan, |
| 123. | J. W. McPike, | 153. | Geo. Ramberg, |
| 124. | Thos. McCann, | 154. | J. Rourke, |
| 125. | Chris Nelson, | 155. | Ole Rosenson, |
| 126. | Oscar Neinie, | 156. | Owen Slavin, |
| 127. | M. Neylan, | 157. | H. Smith, |
| 128. | Ole Nelson, | 158. | J. Stanger, |
| 129. | C. Noegan, | 159. | Chas. Swanson, |
| 130. | Thos. O'Reilly, | 160. | Jas. Steele, |
| 131. | D. O'Leary, | 161. | L. Subat, |
| 132. | A. Olsen, | 162. | John Smith, |
| 133. | O. Olsen, | 163. | L. Studness, |
| 134. | D. O'Neil, | 164. | C. Stream, |
| 135. | E. M. Olander, | 165. | Wm. Sass, |
| 136. | G. Pennell, | 166. | R. Thompson, |
| 137. | Ed Pauley, | 167. | Ed Wesner, |
| 138. | John Peterson, | 168. | R. Williams, |
| 139. | John Pecsenye, | 169. | Jas. Whalen, |
| 140. | Frank E. Price, | 170. | E. Williams, |
| 141. | Chas. Pidgeon, | 171. | J. Waline, |
| 142. | John Pierson, | 172. | Pat White, |
| 143. | R. Pollock, | 173. | John West, |
| 144. | A. Pederson, | 174. | Robt. Youngberg. |

The official ballot at the precinct contained the names of eighty-two candidates for State, county, and township officers, to wit: Member of Congress, governor, lieutenant-governor, secretary of State, attorney-general, treasurer, auditor, superintendent of public instruction, clerk of Supreme Court, chief justice, two associate justices, district judge, county clerk, sheriff, senator, ten representatives, three county commissioners, clerk of court, treasurer, county superintendent of schools, surveyor,

assessor, coroner, public administrator, attorney, two justices of the peace, and two constables. The Republican and Democratic parties had respectively made nominations for these positions, and the constitution was submitted for approval. Each of these alleged voters exercised fully his right of suffrage according to the returns which embody the figures.

| 21 | Democrats had | | | 171 | votes, making | 3,591 | votes. |
|---|---|---|---|---|---|---|---|
| 3 | " | including constitution | | 172 | " " | 516 | " |
| 1 | " | " | " | 173 | " " | 173 | " |
| 14 | " | " | " | 170 | " " | 2,380 | " |
| 1 | " | " | " | 169 | " " | 169 | " |
| 1 | " | " | " | 168 | " " | 168 | " |
| 1 | " | " | " | 165 | " " | 165 | " |

Total............................................7,162 votes.

| 20 | Republicans had | | | 3 | votes, making | 60 | votes. |
|---|---|---|---|---|---|---|---|
| 5 | " | including constitution | | 2 | " " | 10 | " |
| 1 | " | " | " | 1 | " " | 1 | " |
| 10 | " | " | " | 4 | " " | 40 | " |
| 4 | " | " | " | 5 | " " | 20 | " |
| 1 | " | " | " | 9 | " " | 9 | " |
| 1 | " | " | " | 6 | " " | 6 | " |

Total..................................... 146 votes.

......................................7,162 "

Grand total.....................................7,308 votes.

One hundred and seventy-four voters had 42 votes to cast, 7,308 votes.

Such mathematical exactness upon the part of so many voters is unprecedented. When we remember that the Australian system prevailed, and that a mark was placed opposite the name of each candidate, and that a large number of these persons had recently obtained the right to vote through declarations of their intention to become citizens of the United States, the result seems to be wonderful. At the same time the proposition for the issuance of bonds in the sum of twenty-five thousand dollars for school purposes excited a slight interest, and only ninety-one voters expressed their wishes thereon.

We will illustrate these views by a reference to the vote of

the other precincts of the county of Silver Bow and the State, upon the adoption of the constitution and the choice of a member of Congress.

Vote of Silver Bow County in 1889 for congressmen and constitution:—

| No. | Precinct. | Carter, Rep. | Maginnis, Dem. | Constitution. for | Constitution. against | Total Constitution. | Total Congress. |
|---|---|---|---|---|---|---|---|
| 1. | Walkerville .......................... | 239 | 208 | 253 | 35 | 288 | 447 |
| 2. | " " .......................... | 107 | 108 | 126 | 21 | 147 | 215 |
| 3. | Centerville............. ............ | 179 | 101 | 151 | 21 | 172 | 280 |
| 4. | " .......................... | 236 | 407 | 371 | 24 | 395 | 643 |
| 5. | Butte .............................. | 183 | 107 | 139 | 14 | 153 | 290 |
| 6. | " .............................. | 135 | 230 | 236 | 14 | 250 | 365 |
| 7. | " .............................. | 159 | 142 | 190 | 14 | 204 | 301 |
| 8. | " .............................. | 78 | 126 | 131 | 17 | 148 | 204 |
| 9. | " .............................. | 200 | 219 | 277 | 24 | 301 | 419 |
| 10. | " .............................. | 156 | 234 | 241 | 26 | 267 | 390 |
| 11. | " .............................. | 133 | 104 | 125 | 21 | 146 | 237' |
| 12. | " .............................. | 244 | 241 | 260 | 22 | 282 | 485 |
| 13. | " .............................. | 198 | 184 | 233 | 30 | 263 | 382 |
| 14. | " .............................. | 110 | 97 | 88 | 16 | 104 | 207 |
| 15. | Parrott ...................... | 208 | 170 | 199 | 65 | 264 | 378 |
| 16. | Meaderville .......................... | 209 | 69 | 162 | 12 | 174 | 278 |
| 17. | " .......................... | 124 | 61 | 75 | 9 | 84 | 185 |
| 18. | South Butte.......................... | 160 | 167 | 203 | 25 | 228 | 327 |
| 19. | Black Tail.......................... | 35 | 28 | 13 | 2 | 15 | 63 |
| 20. | Centennial Brewery.................... | 90 | 77 | 88 | 18 | 106 | 167 |
| 21. | Rocker .......................... | 91 | 30 | 53 | 4 | 57 | 121 |
| 22. | Burlington.......................... | 142 | 63 | 77 | 11 | 88 | 206 |
| 23. | Silver Bow....... .................. | 16 | 18 | 18 | 3 | 21 | 34 |
| 24. | " " Junction.................. | 14 | 21 | 15 | 5 | 20 | 35 |
| 26. | McCune's Wood Camp................ | 25 | 161 | 142 | 7 | 149 | 186 |
| 27. | German Gulch...................... | 2 | 12 | 8 | | 8 | 14 |
| 28. | Norton Gulch........................ | 18 | 5 | 2 | | 2 | 23 |
| 29. | Feeley.............................. | 8 | 19 | 13 | 1 | 14 | 27 |
| 30. | Divide............. ............... | 18 | 12 | 22 | 3 | 25 | 30 |
| 31. | Melrose............................. | 34 | 28 | 38 | 2 | 40 | 62 |
| 32. | Soap Gulch........................... | 8 | 2 | 6 | 1 | 7 | 10 |
| 33. | Clipper Nine......................... | 6 | 5 | 7 | | 7 | 11 |
| | Total......................... | 3,566 | 3,456 | 3,962 | 467 | 4,429 | 7,022 |

No polls were opened at precinct No. 25.

The following was the result in the State:—

Carter, 19,922 votes; Maginnis, 18,264 votes; total for congressman, 38,186 votes; for the constitution, 24,676 votes; against the constitution, 2,274 votes; total upon the constitution, 26,950 votes, leaving a difference of 11,236 votes. Although the percentage of non-voters upon the submission of the constitution, when compared with the votes recorded for the congressional candidates, is high and substantially the same throughout Montana, in precinct 34 the rule does not operate, and every elector voted according to the face of the returns. Even in

precincts 32 and 33 where only 10 and 11 votes respectively were polled, this average is unchanged. The number of voters in the county at this election is shown by another table to have been 7,329.

When we consult the returns of these precincts for the candidates for the offices which we have mentioned, it will be seen that there is a great difference between the possible and the actual vote. The number of citizens who failed to signify their choice in some respects is so regular, that the average can be applied generally.

Vote of Silver Bow County in 1889 for officers:—

| Precinct No. | Voters. | Possible Vote. | Actual Vote. | Difference. |
|---|---|---|---|---|
| 1 | 447 | 18 327 | 17,860 | 467 |
| 2 | 221 | 9,061 | 8,242 | 819 |
| 3 | 296 | 12,136 | 10,418 | 1,718 |
| 4 | 661 | 27,101 | 25,115 | 1,986 |
| 5 | 298 | 12,218 | 11,304 | 914 |
| 6 | 388 | 15.908 | 14,883 | 1,025 |
| 7 | 315 | 12,915 | 12,992 | 823 |
| 8 | 207 | 8.487 | 8,224 | 263 |
| 9 | 432 | 17,712 | 16,597 | 1,115 |
| 10 | 415 | 17,015 | 15,590 | 1,425 |
| 11 | 244 | 10,004 | 9,345 | 659 |
| 12 | 515 | 21,115 | 18 686 | 2,429 |
| 13 | 394 | 16,154 | 15,009 | 1,145 |
| 14 | 223 | 9,143 | 7,949 | 1,194 |
| 15 | 392 | 16,072 | 14,879 | 1,193 |
| 16 | 307 | 12,587 | 10,890 | 1,089 |
| 17 | 199 | 8,159 | 7,081 | 1,078 |
| 18 | 341 | 13,931 | 12,540 | 1,441 |
| 19 | 65 | 2.665 | 2,292 | 373 |
| 20 | 176 | 7,216 | 6,408 | 808 |
| 21 | 124 | 5,084 | 4,530 | 554 |
| 22 | 221 | 9,061 | 8,042 | 1,019 |
| 23 | 37 | 1,517 | 1,385 | 132 |
| 24 | 36 | 1,476 | 1,332 | 144 |
| 25 | No | election | held. | |
| 26 | 190 | 7,790 | 7,217 | 573 |
| 27 | 15 | 615 | 520 | 95 |
| 28 | 28 | 1,148 | 835 | 313 |
| 29 | 27 | 1,080 | 936 | 144 |
| 30 | 31 | 1.240 | 2,319 | 208 |
| 31 | 63 | 2,520 | 1,032 | 201 |
| 32 | 10 | 410 | 393 | 17 |
| 33 | 11 | 451 | 433 | 18 |
| Total | 7,329 | 300,368 | 276,386 | 23,982 |

Another peculiarity of this vote, which, however commends it to our favor, is the triumph which the supporters of the constitution achieved. It is the greatest majority that has been reported in any precinct of similar numbers, being 172 votes for and 2 votes against it.

While this question was not debated during the campaign from

a partisan standpoint, the votes thereon were apportioned in the same manner as if they had been for the Democrats and against the Republicans. The county of Silver Bow without precinct 34 was Republican, and the insignificant part of the ballots that was returned for its candidates under these conditions must be noted as strange and without an exemplar in Montana.

*Third*—We will review the testimony proving that actual fraud was perpetrated at precinct 34.

Before the record is examined it should be observed that most of the persons, whose names are registered upon the poll-book of the precinct, were employed at the time of the election in building a railroad near that point, and vanished when the work was finished. It was therefore difficult to produce them upon the trial as witnesses, and the number who testified was 10 out of 174 voters. The appellant offered in evidence two subpœnas with their returns duly verified showing the names of the voters at precinct 34 who could not be found, to establish diligence upon his part to procure their attendance. The objection of the respondent to their introduction upon the grounds that they were irrelevant and immaterial was sustained by the court. The statute, *supra*, provides that "each party shall be entitled to subpœnas, and subpœnas *duces tecum*, as in ordinary cases in law."

We affirmed the ruling of the court in *Heyfron* v. *Mahoney*, *supra*, that these papers should be admitted for this purpose.

In *Blue* v. *Peter*, 40 Kan. 717, the court said: "In addition there were subpœnas issued for about ninety of those claimed by Peter to be fictitious voters, and the return of the officer shows they were not found in Harper Township. . . . . The failure to find the residence of so large a number of purported voters is more than suggestive, and to our minds a very strong proof of fraudulent voting." The effect of this error upon the rights of the parties will not be further considered, but the circumstances afford a satisfactory explanation of the failure of the contestant to bring into court all the voters of the precinct.

Charles Johnson testified that he was a registered voter of precinct 34, and that he did not vote at this election. His name is upon the poll-book as one who then and there voted, and is numbered 82.

Five voters, Axel Anderson, Charles Lindgreen, John A.

Anderson, A. Green, and John Petterson, did not vote upon the constitution.   Axel Anderson testified :—

"Did you vote for the constitution or against it?   I didn't vote at all for that."

Charles Lindgreen, testifying through an interpreter, answered :—

"Did he vote for the constitution or against it?   He did not."

John A. Anderson testified :—

"Did you vote for the constitution or against it?   No, sir, I left that blank."

He also swore that he marked the ballots for A. Green and John Petterson.

"Did you mark the constitution on either of them?   No, sir."

G. Pennell testified :—

"And you did not vote at all for Carter and Maginnis?   For neither."

C. Lindgreen testified :—

"Who did he vote for?   Martin Maginnis and two Republicans.

"Did he vote for the balance of the Democrats besides the Republicans?   No, sir.

"Did he only vote for three persons on the ticket?   Only three."

G. Pennell testified that he marked his ballot for "all of the Republican candidates except four," and three Democrats, Toole, Bickford, and Caplice.

Axel Anderson testified that he "voted the Republican ticket," excepting a Democrat, who "was one of the last ones on the ticket."   John A. Anderson, A. Green, and John Petterson voted "for the straight Republican ticket."

The time when the witnesses deposited their ballots is generally given in their testimony and can be stated as follows: Michael F. Hogan, eight o'clock; John Morrison, quarter past eight o'clock; C. Lindgreen, ten o'clock; D. O'Neil, half past ten o'clock; Axel Anderson, one or two o'clock; G. Pennell, three to four o'clock; and John A. Anderson, A. Green, and John Petterson voted together, but the hour is not revealed.

Axel Anderson testified that he left his ticket with Pennycook, who held it in his hand, as he went out, and also said:—

"Do you undertake to say that that ticket was marked or stamped by Pennycook after you handed it to him, or before? After.

"Are you sure of that? Yes, sir."

C. Lindgreen testified: —

"After he had marked his ballot, what did he do with it? He gave it to Pennycook.

"What did Pennycook do with it? He put a mark on it and put it in the ballot-box.

"What kind of a mark did he put on it? He had something like that (the official stamp)."

Charles Omo, the witness above named, further testified that he and Charles Wilson went into the voting place after the polls were closed and saw Pennycook and Morrison there.

"What were they doing when you went in? This Pennycook was doing some kind of stamping work there.

"What with? With a stamp.

"Was it anything like that (the official stamp) on the table? Yes, sir, something similar.

"What was he stamping? Ballots.

"What kind of looking papers were they, for size and color, etc? About six or eight inches in width, and twenty or twenty-four in length.

"What else did you see him do while you were there. (Then follows the answer which is given *ante,* p. 596.)

"When he jumped up did you see anything else? The only thing that I noticed was a bunch of papers that he had been sitting on.

"What were the papers? I could not say; I took them to be ballots; they fell on the floor as he jumped up off the chair."

On cross-examination, this witness answered:—

"How many times did this gentleman stamp these papers? Once only.

"Positive? Yes, sir."

John Wilson, the above-named witness, corroborated the testimony of Omo, and, in reply to questions by the court, said:—

"How many did he stamp? He must have stamped probably two.

"In how long a time? Just a short bit, probably a minute.

"Was that all he stamped while you were in there? That was all I noticed.

"Were you in there longer than the time he occupied in stamping two papers? I don't think I was.

"Did he have anything else there except papers? He might have had a pencil.

"Did you see any books or check lists there? No, sir; I didn't take notice to it.

"Did you see what impress this stamp left on the paper? No, sir.

"Where was Omo at this time? He was in there."

The foregoing testimony was not contradicted by any person, and no effort was made by the respondent to impeach one of the witnesses. Pennycook and Morrison, who must possess the best evidence upon all the issues concerning the vote of precinct 34, were not put upon the stand. Through the remarks of counsel in the argument we learn that Pennycook, during the trial, was in Scotland and Morrison was in Colorado. This case, in some of its phases, has invaded the Senate chamber, and been expanded to national proportions, and the materiality of their testimony can be readily understood. But the subpœna of the appellant could not command Pennycook and Morrison to appear before the court and tell the truth.

When, therefore, the evidence which was produced is weighed, these facts are established: Some person voted in the name of Charles Johnson during his absence. All the electors of the precinct did not vote for or against the constitution. Pennell did not vote for either candidate for Congress. Lindgreen marked only three out of eighty-two candidates upon the ballot. Three voters cast "the straight Republican ticket." Axel Anderson marked all the Republican candidates except one, probably a constable, and Pennell voted for three Democrats and thirty-seven Republicans. Pennycook marked illegally some ballots after their delivery to him to be deposited in the box. The voters did not march to the polls in alphabetical array, and the poll-book does not disclose the number or order of those who

voted. Pennycook and Morrison stamped ballots after the polls were closed, and Pennycook had a package under him when Wilson and Omo were present and required to leave the polling place. The returns of precinct 34 are fraudulent, and do not state truly the vote which each candidate for office received at the last election. And voters who had a right to be present when the votes were counted, were ejected from the polling place by the judges when they were stamping ballots after the closing of the polls.

*Fourth* — We will apply to the facts the principles of the law, which are laid down by the authorities.

The extraordinary length of this opinion restrains us from collecting the cases which throw light upon this subject, and we shall rely upon the doctrines which are stated in the text-books. It is admitted by all that the statutes regulating elections are designed to protect the precious right of suffrage by securing an impartial count of the ballots, and the choice of the people for public trusts. The duties of the clerks of an election are as essential and as distinctly defined as those of the judges, so that they can be checks upon each other, and vindicate the purity of the ballot-box. While many of the statutory requirements are directory, and the form is always subordinate to the substance, they are nevertheless considered by the legislative department safeguards of the voter in the exercise of this privilege of citizenship. They have been violated with impunity by the officers of precinct 34, with the purpose of defeating the will of the people. Waiving the point that the returns are not properly certified, what legal weight attaches to them?

Mr. Paine says, in his work on Elections: "Poll-books duly certified and returned are *prima facie* evidence of the truth of their contents; but the presumption so raised may be rebutted, by proof that they are fraudulent and fictitious to such an extent as to render them wholly unreliable." (§ 592.) Mr. Mechem writes in his treatise on Public Officers: "It is presumed that the officers of election have done their duty, and that the returns made by them are a full and fair statement of the true result, and this presumption is to be given effect until they are shown to be unreliable." (§ 227.) Mr. McCrary, in his treatise on Elections, says: "The return must stand until such facts are

proven as to clearly show that it is not true. When shown to be fraudulent or false, it must fall to the ground." (§ 536.) "If an officer of the election is detected in a wilful and deliberate fraud upon the ballot-box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not, of itself, sufficient to affect the result. The reason of the rule is, that an officer who betrays his trust in one instance is shown to be capable of the infamy of defrauding the electors, and his certificate is therefore good for nothing. . . . . We repeat, therefore, the opinion expressed in a former chapter, that a wilful and deliberate fraud on the part of such an officer, being clearly proven, should destroy all confidence in his official acts, irrespective of the question whether the fraud discovered is of itself sufficient to change the result." (§ 539.)

The nature of the proof to establish fraud is accurately defined in *Wheat* v. *Ragsdale*, 27 Ind. 206, and Mr. Justice Elliott for the court says: "Direct and positive proof of the alleged fraud would in such a case be more satisfactory to the court or jury trying the case. Such frauds, however, are seldom committed in the presence of those who are not participants in them, and if only direct and positive evidence were admissible, few, if any, of them would be brought to light. We are not aware of any reason why frauds upon the ballot-box, and thereby upon candidates for the offices to be filled, may not as well be established by circumstantial evidence as frauds of any other character." In the American and English Encyclopædia of Law the rule is stated as follows: "While fraud is not to be presumed, it is equally true in election as in other cases, that it is usually proved by circumstantial evidence. It would be very difficult, and generally impossible, to prove an agreement between the parties who committed the fraud; and if no circumstantial evidence was recognized as sufficient, the frauds would generally go unrebuked." (Vol. 6, p. 354.)

In *Littlefield* v. *Green*, Brightly's Leading Cases on Elections, 494, the court observes: "The names of the first 668 voters, as appears from the poll-books, appear to have been registered and voted in alphabetical and numerical order. . . . . One of them (the officers who conducted the election) swears that he cannot account for the names appearing in alphabetical order on the poll-books

from A to Z and Z to A, but thinks that men voted in that order, a thing impossible and incredible." When, where, and by whom were the poll-books and returns of precinct 34 made? The transcript may be searched in vain for any answer to these important inquiries. No witness ever saw the name of one voter recorded in the poll-book.

In *Knox County* v. *Davis*, 63 Ill. 417, the court views, as a circumstance tending to prove fraud on the part of the officers of an election, their conduct, and says: "Again, the moderator of the election has absented himself, or absconded since the proceeding was instituted, so that his evidence could not be had." In *Russell* v. *McDowell*, 83 Cal. 70, which was an election contest affecting the office of sheriff, the Supreme Court of California referred to similar conduct, and Mr. Chief Justice Beatty said: "Officers of election are like all other persons, presumed to know the law, and their deliberate omission to follow directions designed to prevent fraudulent voting, certainly calls for explanation. It casts suspicion upon their integrity, and is sufficient *prima facie* to make out a case of fraud. No doubt such omission is susceptible of explanation, and we are very willing to believe that the officers of these precincts erred through ignorance of the law, and were not actually guilty of fraudulent intent. But, as the case is presented, we cannot indulge that presumption. The officers were not called as witnesses, as they should have been, to prove that they acted as they did through ignorance, and not with fraudulent purpose; and, in the absence of any rebutting proof on this point, we feel constrained to hold that the contestant made out a case of malconduct on the part of the election boards. . . . . Here no proof in rebuttal was offered, and the evidence for contestant stands absolutely uncontradicted." These authorities are directly in point, and we hold that the commission of fraud at the election in precinct 34 has been shown by both direct and circumstantial evidence.

What is the remedy? If possible, the poll should be purged, and the legal vote should not be suppressed by reason of the malconduct of the officers of the election. The absence of the citizens of the precinct is an obstacle which cannot be overcome. How can the legitimate ballots be ascertained? If we reject the returns, we can reasonably presume that the vote of precinct

34 upon the constitution was in the same ratio as the remainder of the county of Silver Bow. A calculation upon this basis demonstrates that this vote should have been 112, and that Pennycook and Morrison may have tampered with 62 ballots. The constitution was not endangered, and there was no urgent demand for the counting of the whole vote of precinct 34 upon the question, but, in the preparation of the overwhelming majorities for certain candidates upon the ballots from governor to constable, policy probably dictated that there should be no exception. There should also have been a difference between the possible and actual vote of this precinct of 584 votes or thereabouts, but, contrary to the rule which prevailed in every polling place of the county, none is returned. This is not the mode of settling the contest, and we must seek relief elsewhere. Upon whom rests the burden of proof under these circumstances?

Paine writes, in his work on Elections: "When a poll-book is so impeached, the burden of proving legal votes by other proof is thrown upon the party claiming them." (§ 592.) "When the proceedings are so tarnished by fraudulent, negligent, or improper conduct on the part of the officers, that the result of the election is rendered unreliable, the entire returns will be rejected, and the parties left to make such proof as they may of the votes legally cast for them." (§ 596.) In *Phelps* v. *Schroder*, 26 Ohio St. 558, the court held: "Where a poll-book is impeached for fraud, and rejected as *prima facie* evidence, it does not follow that the legal voters who had voted at the election will be disfranchised, or that the candidates will be deprived of the legal votes they actually received at the election in the township. . . . . When the poll-book was rejected, the way was opened for either party by testimony other than the poll-book, and in addition to it, to have proved the number of legal votes he received in the township. . . . . Of course, the burden of proof would have been on the party claiming the legal votes." The last sentence of section 539, *supra*, McCrary on Elections, is the following: "The party taking anything by an election conducted by such an officer must prove his vote by evidence other than the return." In American and English Encyclopædia of Law, page 353, it is written: "Fraud destroys the value of returns as evidence. The fraud does not invalidate

the legal votes cast, but, by destroying the presumption of the correctness of the returns, it makes it necessary that any person who claims any benefit from the votes shall prove them; and where no proof is offered, and the frauds are of such a character that the correct vote cannot be determined, the return of the precinct will be rejected." The findings of the court show that the majority for Lloyd in the remaining precincts of the county of Silver Bow was 127. Under the authorities Sullivan would be compelled to prove that he received, at least, 150 of the 174 votes in precinct 34 (assuming that the last number represents the legal voters), in order to obtain any majority. No evidence of this description was offered by the respondent.

Some of the citations refer to the legal necessity for rejecting the vote of a precinct under the facts appearing in the record, and all the authorities lead to this conclusion. In American and English Encyclopædia of Law, page 334, we read: "But if the irregularities are so great that the election is not conducted in accordance with law, either in form or substance, where they are matters of substance, and render the result uncertain, and where they are fraudulent, and the result is rendered uncertain thereby, the returns should be set aside, and the persons required to prove the legal votes cast for them. Where the incompetency, inefficiency, and reckless disregard of the essential requirements of the law prevail to such an extent that the acts of the officers must be deemed unreliable, this will, of necessity, have the same effect as fraudulent action, and be ground for rejecting the returns." Says Mr. McCrary, in his work on Elections: "While a mere irregularity which does not affect the result will not vitiate the return, yet where the provisions of the election law have been entirely disregarded by the officers, and their conduct has been such as to render their returns utterly unworthy of credit, the returns must be rejected. In such a case the returns prove nothing." (§ 476, 3d ed.)

We therefore conclude that the findings of the court below, regarding the legal effect of the election held upon the first day of October, 1889, at precinct 34, are contrary to the evidence and should be set aside. The returns thereof do not show the true result of the votes which were cast for the candidates, including the contestants for the office of sheriff. The officers

did not canvass, count, and make said returns. The election was conducted in violation of the laws regulating the same, and the opportunity was afforded for the perpetration of crimes against the suffrages of the people. Ballots were illegally marked after they had been delivered to the judges to be put in the box. The official stamp was unlawfully placed upon ballots by one of the judges after the polls were closed. Fraud was committed by the officers of the election to such an extent that the actual vote of the precinct cannot be ascertained, and the returns are valueless as evidence and must be rejected.

When these findings are discarded, the official vote of the board of canvassers of the county remains unaltered, and Lloyd should have been declared the person who was duly elected to said office.

It is therefore ordered and adjudged that the judgment be reversed with costs, and that the case be remanded to the court below, with instructions to enter a judgment that John E. Lloyd was duly elected sheriff of the county of Silver Bow aforesaid, for the term beginning with the date of the admission of the State of Montana into the Union, and ending on the first Monday in January, 1893, and make the necessary orders to carry into effect this judgment.

HARWOOD, J., and DE WITT, J., concur.